City of Milwaukee, Respondent, v. Milwaukee & Suburban Transport Corporation, Appellant.

*January 7—February 3, 1959.*

For the appellant there were briefs by *Quarles, Herriott & Clemons,* attorneys, and *Lester S. Clemons* and *Arthur H. Laun, Jr.,* of counsel, all of Milwaukee, and oral argument by *Mr. Lester S. Clemons* and *Mr. Laun.*

For the respondent there was a brief by *Walter J. Mattison,* city attorney, and *Harry G. Slater,* deputy city attorney, and oral argument by *Mr. Slater.*

MARTIN, C. J.  The question is whether or not the "license fees" exacted under these ordinances constitute a tax for revenue or a charge for regulation or a contract. It is undisputed that at the time the ordinances were adopted the city had authority to tax the company for revenue as well as for regulatory purposes.

As stated in *Wisconsin Telephone Co. v. Milwaukee* (1905), 126 Wis. 1, 13, 104 N. W. 1009, where the power to license exists, a reasonable discretion is vested in the municipality, but courts will look into ordinances with a view of determining whether they are passed for the purpose of revenue, although sought to be upheld as police regulations. Cities should not be permitted, under the guise of their regulatory power, to collect revenue for the benefit of the city regardless of the amount necessary to defray the expense of its regulation.

In its decision the trial court called attention to the fact that in the conversion ordinances the city undertook to repave and widen streets to accommodate the trackless trolleys and bear the expense of the obligation, formerly that of the company, to repave and maintain the track zones; that the city obligated itself to prohibit parking of automobiles along portions of the routes, in connection with which the court took judicial notice of the fact that the city has been put to the

expense of acquiring property for off-street parking, an expense due in part to such parking limitations. The court stated that the ordinances reveal substantial benefits proceeding to the company and a concurring disadvantage and expense to the city. Therefore, it reasoned, the fees did not constitute a tax for revenue but, rather, compensation for the costs assumed and services rendered by the city.

According to Webster's New International Dictionary (2d ed. 1954), a "'tax" (noun) is:

"A charge, esp. a pecuniary burden imposed by authority; specif., a charge or burden, usually pecuniary, laid upon persons or property for public purposes; a forced contribution of wealth to meet the public needs of a government."

To "tax" (verb) is defined as:

"To assess with, or subject to the payment of, a tax or taxes; esp., to exact money from for the support of government; . . ."

In 51 Am. Jur., Taxation, p. 35, sec. 3, it is stated:

"A tax is a forced burden, charge, exaction, imposition, or contribution assessed in accordance with some reasonable rule of apportionment by authority of a sovereign state upon the persons or property within its jurisdiction, to provide public revenue for the support of the government, the administration of the law, or the payment of public expenses. Any payment exacted by the state or its municipal subdivisions as a contribution toward the cost of maintaining governmental functions, where the special benefits derived from their performance is merged in the general benefit, is a tax."

In 51 Am. Jur., Taxation, p. 34, sec. 2, it is stated:

"The term 'taxation' defines the power by which the sovereign raises revenue to defray the necessary expenses of government. Taxation is merely a way of apportioning the cost of government among those who in some measure are

privileged to enjoy its benefits and must bear its burdens. The purpose of taxation on the part of government is to provide funds or property with which to promote the general welfare and protection of its citizens. Taxation, in its broadest and most general sense, includes every charge or burden imposed by the sovereign power upon persons, property, or property rights for the use and support of the government and to enable it to discharge its appropriate functions, and in that broad definition there is included a proportionate levy upon persons or property and all the various other methods and devices by which revenue is exacted from persons and property for public purposes."

In 38 Am. Jur., Municipal Corporations, p. 13, sec. 321, it is stated:

". . . there is a sharp distinction between a municipal license for revenue and one for regulation under the police power; the first named is a tax and is to be construed under the principles and rules governing taxing powers, while the latter is under the police power, looking toward the health, morals, safety, or general welfare of the community."

The substance, and not the form, of the imposition is the test of its true character. It is stated in 4 Cooley, Taxation (4th ed.), p. 3511, sec. 1784:

"The distinction between a demand of money under the police power and one made under the power to tax is not so much one of form as of substance. The proceedings may be the same in the two cases, though the purpose is essentially different. The one is made for regulation and the other for revenue. If the purpose is regulation the imposition ordinarily is an exercise of the police power, while if the purpose is revenue the imposition is an exercise of the taxing power and is a tax."

See also 9 McQuillin, Mun. Corp. (3d ed.), p. 26, sec. 26.15. The distinction between taxation for revenue and for regulation is determined by the relationship between the cost

to, or services provided by, the city and the charge imposed. In 1 Cooley, Taxation (4th ed.), p. 98, sec. 27, it is stated:

". . . a charge of a fixed sum which bears no relation to the cost of inspection and which is payable into the general revenue of the state is a tax rather than an exercise of the police power. Whether an imposition is called a license 'fee' or a license 'tax' is worthy of little consideration, since its real nature is the test."

Following these rules, in *Chesapeake & Potomac Telephone Co. v. Morgantown* (W. Va. 1958), 105 S. E. (2d) 260, the court held "use fees" involving no regulatory features which would bring them within the category of license fees were imposed purely for revenue purposes, and in the absence of any delegation by the state to the municipality of the power to exact such fees the ordinance which attempted to do so was invalid.

Apparently the trial court took the view that it is sufficient—in order to bring the charge under the police power— for the city to show that by adopting the conversion ordinances it assumed expenses and inconveniences not previously borne by it. That does not satisfy the test. In the first place, we do not read out of these ordinances the same evidence of expense and disadvantage to the city that the trial court did. In most of the instances where the city agreed to restore the track zone and where expenses for repairs or supervision were anticipated, the company either paid a lump sum in discharge of its obligations in that respect or agreed to pay in the future as the expenses were incurred. In one ordinance the lump-sum payment by the company amounted to $275,000.

The trial court also attributed the city's need to acquire off-street parking lots, at least in part, to the prohibition of parking at the curb for 50 feet at trackless trolley loading

zones and other parking restrictions along the routes. We cannot take judicial notice of such fact. All cities in the state have been faced with parking problems, necessitating the acquisition of off-street parking facilities for various reasons such as the increased use of automobiles, the increased number of automobiles, and the increased population of cities.

At $10 per passenger seat the annual fees charged under these ordinances amount to over $100,000. This, we repeat, is in addition to all charges for repaving, etc., referred to above. In *Milwaukee v. Milwaukee E. R. & L. Co.* (1911), 147 Wis. 458, 462, 133 N. W. 593, where the city attempted to impose an annual license fee of $15 per streetcar, this court said:

"It is apparent on the face of the ordinance and from the amount of the fee imposed that it is an imposition for the purpose of revenue, and hence it cannot be treated as an exaction for the purpose of covering the expense incident to the supervision and regulation of the street railway business."

In another such case, *Milwaukee E. R. & L. Co. v. Milwaukee* (1918), 167 Wis. 384, 387, 167 N. W. 428, where the city again attempted to impose the $15 fee, it was said:

"Under the ordinance in question the fee exacted was a revenue measure, therefore the ordinance cannot be upheld. . . .

"Whether under the police power the city still has authority to regulate street railways by ordinance we need not consider, because it is clear that the ordinance under consideration was not passed as a regulation but as a revenue measure."

In holding the ordinances here to be regulatory measures, the trial court relied upon *Oshkosh v. Eastern Wisconsin E. Co.* (1920), 172 Wis. 85, 89, 178 N. W. 308. There the city, in granting a franchise to the defendant to extend its interurban electric railroad from Fond du Lac to Oshkosh, required the payment of $35,000 in annual instalments of

$1,000 each for thirty-five years. The court held that "upon the pleadings as they stand we cannot now say as a matter of law that it clearly appears or is to be presumed" that the provision for the annual payment was a revenue-producing measure. In that instance the city of Oshkosh had no authority to tax for revenue purposes. Thus, the court was forced to presume the legality of the charges under the conditions set forth, and this distinguishes the case from the instant one. At the time the ordinances involved here were adopted the city of Milwaukee had the authority to tax both for revenue and for regulation.

The factors presented in this case are, (1) the fact that at the time the ordinances were adopted the city had authority to impose upon the company both a tax for revenue and fees for regulation; (2) the large amount of the fees; and (3) the fact that the city has not attempted to show that the fees bear a relation to, or are an approximation of, the expenses suffered and the services rendered by the city, directly attributable to the operation of the trackless trolley service. From a consideration of these factors we are compelled to conclude that the charges imposed constitute a tax for revenue and are thus invalid under sec. 76.54, Stats.

In the past ten or more years while the city of Milwaukee was authorized to tax the company for revenue, municipalities generally have been seeking new sources of revenue. Under such circumstances it is difficult to believe that the city took no advantage of its authority and that the charges imposed by these ordinances in no way constituted the exaction of such a tax.

The basic argument of the city on appeal is that the ordinances in question are binding contracts entered into between the city and the company, effective only upon acceptance of their terms by the company, and that the legislature has no power to impair the obligation of such contracts.

It is well established that the control of streets and highways is a governmental function. As stated in 10 McQuillin, Mun. Corp. (3d ed.), Streets and Alleys, p. 603, sec. 30.39:

"The use of streets is designed for the public at large, as distinguished from the legal entity known as the city, or municipal corporation. The management of highways may be characterized as a municipal duty relating to governmental affairs. . . . In this country the control of highways is primarily a state duty, subject to the property rights and easements of the abutting owner, except to the extent that such control has been delegated to the municipality. . . . The reason for this is that 'the highways belong to the state,' and are subject to its control and regulation."

In sec. 30.40 of the same text the author states that the extent of a city's control of its streets depends upon the legislative grant of authority, its control pursuant to such delegation being exercised as the state's agent. In 12 McQuillin, Mun. Corp. (3d ed.), Franchises, p. 45, sec. 34.13, it is stated:

"Primarily the legislature, representing the people at large, possesses full and paramount power over all highways, streets, and alleys in the state. Therefore, the power to grant franchises to use the streets resides primarily in the legislature, and it has the power to grant to a public service corporation the right to use streets without compensation to, or the consent of, the municipality, unless the particular state constitution provides for such consent."

Further, in sec. 34.14, p. 51:

"It is undisputed that a municipal corporation has no inherent power to grant a franchise or license to use the streets and that its authority is limited to that conferred upon it expressly or by implication by the state constitution or the legislature."

See also *Frederick v. Douglas County* (1897), 96 Wis. 411, 71 N. W. 798; *Commissioners v. Lucas* (1876), 93 U. S. 108, 23 L. Ed. 822.

This fundamental concept is the basis of the rule, as stated in *Douglas County v. Industrial Comm.* (1957), 275 Wis. 309, 314, 81 N. W. (2d) 807:

". . . the legislature may, with the consent of the other party, revoke any contract entered into by a county or other municipal corporation in performance of a governmental function, and in so doing there is no violation of the constitutional prohibition against a state taking action to impair the obligation of a contract. This rule is stated in 37 Am. Jur., Municipal Corporations, pp. 699, 700, sec. 89, as follows:

" 'A contract to which a municipal corporation is a party, relating to a public and governmental matter, may, however, be revoked by the legislature with the consent of the other party without thereby violating the right of the municipality.' "

The court in that case went on to discuss the decision in *Worcester v. Worcester Consolidated Street R. Co.* (1905), 196 U. S. 539, 25 Sup. Ct. 327, 49 L. Ed. 591, enunciating the rule, and which was cited with approval in *Madison Metropolitan Sewerage Dist. v. Committee* (1951), 260 Wis. 229, 50 N. W. (2d) 424. It further quoted from *Trenton v. New Jersey* (1923), 262 U. S. 182, 188, 43 Sup. Ct. 534, 67 L. Ed. 937, as follows:

" 'The power of the state, unrestrained by the contract clause or the Fourteenth amendment, over the rights and property of cities held and used for "governmental purposes" cannot be questioned.' "

And from *Holland v. Cedar Grove* (1939), 230 Wis. 177, 189, 282 N. W. 111, 282 N. W. 448:

" 'Municipal corporations have no private powers or rights as against the state. They may have lawfully entered into contracts with third persons which contracts will be protected

by the constitution, but beyond that they hold their powers from the state and they can be taken away by the state at pleasure.' " (Citing cases.)

Then the court in the *Douglas County Case, supra,* page 315, went on to say:

"The contract rights arising under an agreement entered into by a municipality, acting in a governmental capacity, and third persons, which are protected by the constitution against impairment by the legislature, are those of the third persons, not those of the municipality. *Worcester v. Worcester Consolidated Street R. Co., supra.* This is because whenever a municipal corporation makes a contract in its governmental capacity with a third party it is the same as if the state itself were one of the two contracting parties, the municipality being but an arm of the state."

Respondent city places a great deal of significance on the fact that the conversion ordinances called for acceptance by the company before they would become effective, arguing that the fees therein agreed upon cannot be considered a tax because the power to tax is not exercised subject to approval of the taxpayer. This argument would seem to ignore the fact that in a case such as this the company always has the right to contest the reasonableness of a license fee. *State ex rel. Cream City R. Co. v. Hilbert* (1888), 72 Wis. 184, 39 N. W. 326. The approval of the company in these ordinances was merely a waiver of its right to contest the reasonableness of the fees. It was certainly to the advantage of the city to obtain such a waiver, since it thereby avoided the expense and delay of litigation.

Franchise ordinances may (as they did here) combine contractual and governmental regulations, without changing the result or affecting the essential character of the power exercised. See 5 McQuillin, Mun. Corp. (3d ed.), Requisites and Operation of Ordinances, p. 80, sec. 15.13. The contractual aspects of these ordinances do not change the character of the

fees therein imposed as the exercise of the city's authority to tax.

The city argues that it had the right to insist upon the payment of reasonable compensation for granting the company valuable rights which it needed in order to effectuate its substitution of service, and that the reasonableness of the compensation is attested to by the fact that the company accepted the terms and paid the fees for many years. We see no particular significance in this. At the time the ordinances were adopted by the common council and accepted by the company, the city had the authority to tax for revenue. The company's acceptance, under those circumstances, could only mean that it considered the fees reasonable as a tax for revenue.

Nor can we see how the nature of the license fees changed in any way because the compensation provided for in the ordinances was paid for in annual instalments rather than a lump sum. There is no evidence that a lump-sum compensation was ever considered by the parties as due the city, with the exception of those instances in which, the city having agreed to take over repaving of the track zones, the company obligated itself to pay certain lump sums in discharge of its obligations with respect to the abandoned railway lines. The nature of the fees is not determined by the method of payment but by the test, as dealt with above, of whether or not they bear any relation to the city's cost of regulation—a relationship which the city has failed to show.

The same answer applies to the city's argument that the license fees are in effect a charge for rental of the streets. Cases from other jurisdictions are cited but we do not consider it necessary to discuss them. There are no cases in this state supporting such a view. Calling the fees a rental charge does not change the fact that there is no evidence showing a relationship between the charge imposed and the cost to the city.

The only power the city has over the use of the streets, aside from its regulatory or police power, must be delegated to it by the state. Without such delegation of authority the city has no power to prevent the company's use of the streets in a reasonable manner consistent with public use. We find nowhere any authority to exact from the company a price for the privilege of operating its lines, except that the state had delegated to the city the right to tax the company for revenue. This is the only authority it had to levy on the company. The city has no right to call such a levy a consideration for a "valuable right" which it has and which the company wants, and exact a price for it. *La Crosse v. La Crosse Gas & Electric Co.* (1911), 145 Wis. 408, 130 N. W. 530. If the $10 per seat fee is a legal assessment, it necessarily must be as a tax authorized by the state for revenue.

*By the Court.*—Judgment reversed, and cause remanded with directions to dismiss plaintiff's complaint.