STATE EX REL. BUILDING OWNERS & MANAGERS ASSOCIA-
TION OF MILWAUKEE, INC., and others, Petitioners,
v. ADAMANY, Secretary, Department of Revenue,
Respondent. [Case No. State 256.]

STATE EX REL. K. C. CORPORATION, Petitioner, v. NUSBAUM,
Secretary, Department of Administration, Respon-
dent. [Case No. State 257.]

STATE EX REL. C. B. CARPENTER, and others, Petitioners,
v. NUSBAUM, Secretary, Department of Administra-
tion, Respondent. [Case No. State 258.]

STATE EX REL. S. & L. REALTY INVESTMENT COMPANY,
Petitioner, v. NUSBAUM, Secretary, Department of
Administration, Respondent. [Case No. State 259.] *

*Nos. State 256–259. Argued March 1, 1974.—Decided June 28, 1974.*
(Also reported in 219 N. W. 2d 274.)

* Motions for rehearing (Case Nos. State 256–259) denied, with-
out costs, on September 4, 1974.

282

284

For the petitioners there were briefs by *Steven E. Keane, James P. Brody, Lawrence J. Bugge, Allen W. Williams, Jr.,* and *Foley & Lardner,* attorneys, and *Charles L. Goldberg* of counsel, all of Milwaukee, and oral argument by *James P. Brody.*

For the respondents there was a brief by *Law Offices Percy L. Julian, Jr.,* attorneys, and *Percy L. Julian, Jr.,*

*Charles Bennett Vetzner,* and *Cheryl Rosen Weston* of counsel, all of Madison, and oral argument by *Percy L. Julian, Jr.*

A brief amicus curiae was filed by *Patricia D. Mc-Mahon* and *Louis J. Mestre,* both of Milwaukee Legal Services, Inc., for Milwaukee Tenants Union and East Side Housing Action Coalition.

HEFFERNAN, J. The plaintiffs are faced with a strong presumption that the law is constitutional. That presumption was explained in *State ex rel. Hammermill Paper Co. v. La Plante* (1973), 58 Wis. 2d 32, 47, 205 N. W. 2d 784, quoting from *Gottlieb v. Milwaukee* (1967), 33 Wis. 2d 408, 415, 416, 147 N. W. 2d 633:

" 'On the other hand, it is a legislative enactment that is attacked as being unconstitutional, and the cardinal rule of statutory construction is to preserve a statute and to find it constitutional if it is at all possible to do so. We have recently said:

" ' " . . . the duty of this court is . . . if possible, to so construe the statute as to find it in harmony with accepted constitutional principles." *State ex rel. Harvey v. Morgan* (1966), 30 Wis. (2d) 1, 13, 139 N. W. (2d) 585.

" 'All legislative acts are presumed constitutional, and every presumption must be indulged to sustain the law if at all possible. *State ex rel. McCormack v. Foley* (1962), 18 Wis. (2d) 274, 279, 118 N. W. (2d) 211; *School Dist. v. Marine Nat. Exchange Bank* (1960), 9 Wis. (2d) 400, 403, 101 N. W. (2d) 112. If any doubt exists it must be resolved in favor of the constitutionality of a statute. *State ex rel. Thomson v. Giessel* (1953), 265 Wis. 558, 564, 61 N. W. (2d) 903. We as a court are not concerned with the merits of the legislation under attack. We are not concerned with the wisdom of what the legislature has done. We are judicially concerned only when the statute clearly contravenes some constitutional provision. *Chicago & N. W. R. Co. v. La Follette* (1965), 27 Wis. (2d) 505, 521, 135 N. W. (2d) 269.' "

To overcome this presumption, the plaintiffs must prove the law to be unconstitutional beyond a reasonable doubt. *Hammermill, supra,* page 46.

The plaintiffs attack the statute on almost every conceivable front. They claim it serves no public purpose, that it is a tax law, and, as such, is void as being in violation of the uniformity clause, art. VIII, sec. 1, of the Wisconsin Constitution; that it classifies both landlords and tenants in an unreasonable and arbitrary fashion and, hence, denies equal protection of the law; that the statute is vague and indefinite and violates due process; that it violates both the state and federal constitutions by mandating the impairment of contracts; and that the taking of property without due process of law is permitted by sec. 539.

If we conclude, for any reason, that the statute is unconstitutional, the case is resolved, and we need not discuss any other issues raised.

The initial broad attack upon the statute is that it serves no public purpose. Both the attack and the defense of the statute are somewhat puzzling, since neither side defines what is meant by public purpose. The plaintiffs appear to be arguing that the statute infringes upon certain rights guaranteed by the constitution against encroachments by either the state or national government, and that such encroachments can only be justified by the statutes serving an articulated public purpose of great moment. Plaintiffs appear to argue that no pressing necessity in the public interest has been spelled out to justify the police power infringement upon a constitutional right. Their argument, however, is vague.

The defendants' response poses at least equal perplexities. While we sympathize with the defendants' bewilderment with the plaintiffs' discussion of public purpose, we are equally at a loss to understand defendants' response.

They argue that the statute complies with the public purpose doctrine and is, therefore, constitutional. However, the public purpose doctrine on which they rely seems to have no relevance to this case. Defendants correctly state the doctrine—public funds may only be spent for public purposes—and argue, apparently, that, in conformance with that doctrine, sec. 539 authorizes the expenditure of funds for a proper public purpose. We say, "apparently," because their rationale is not spelled out. The defendants' assumption appears to be that the dollar amount of taxes that could have been levied by the state or other tax units would have been public funds if collected. Since they were not collected, such sums constituted a windfall to lessors that was government money—its public funds to disburse as it saw fit so long as the recipients of this largesse were a class (tenants) to whom government funds could properly go. Perhaps we misstate the defendants' position, but if we do, we see no relevancy whatsoever to their argument. Their position rests upon the doubtful logic that what the government did not take in taxes is nevertheless the government's to appropriate as it sees fit for any purpose that is public.

This premise is dubious. It would have some germ of relevance if it were apparent that the reduction of taxes was in all cases the result of shared revenues, *i.e.,* that they represented funds returned to the municipality that the local government could either use for other governmental purposes or pass on to taxpayers as a credit or reduction of their tax bills.

It is apparent from the words of the statute that it does not operate on that basis. The reduction of rent that comes as the result of the reduction of taxes could well be triggered simply because a municipality elected to perform fewer municipal services for which it was required to raise less taxes. We see no logic to the position that, because the government could, if it wished,

have taxed more, it could order the diversion to others of what it could have levied but did not.

Despite the amorphous quality of both arguments in respect to public purpose, we conclude that the law is within the legislature's authority to enact, in the sense that it attempts to pass along to renters tax "concessions" that owners have received. Budget Policy Paper 31, February, 1973, pointed out that 53.5 percent of low-income families. rent their housing. It was estimated that a device that would pass along to tenants the tax concessions that landlords would receive might result in $19,000,000 per year of tax relief to 380,000 tenants.

We find this to be a public purpose in the sense that it is a matter within the general concern of government and of legislation. Presumptively, at least, some public purpose is sought to be served by this law. We cannot state out of hand that, as far as public purpose is concerned, this legislation is wholly without reason or objective associated with some concept of the general welfare. Under the presumption of constitutionality, we must assume that at least a goodly portion of tenants will be benefited by this legislation and that at least some of those tenants are within an impoverished class that is of particular concern to a state government.

To say that the act is not unconstitutional because it outwardly serves some public purpose says but little, since the more important challenge to the law is whether the public purpose served is so important and exigent that it will justify the invocation of the state's police power in derogation of constitutionally secured rights.

Plaintiffs also argue that the statute fails because it is a property tax law which fails to operate uniformly on all property. Uniformity is required by the Wisconsin Constitution in respect to property taxes.

We find that the conflicting arguments in respect to uniformity miss the mark, for we see none of the indicia

of a tax law in sec. 539. 1 Cooley, *Taxation* (4th ed., 1924), p. 61, sec. 1, said:

"Taxes are the enforced proportional contributions from persons and property, levied by the state by virtue of its sovereignty for the support of government and for all public needs."

This definition was expressly approved in *Fitch v. Wisconsin Tax Comm.* (1930), 201 Wis. 383, 387, 230 N. W. 37.

*Milwaukee v. Milwaukee & Suburban Transport Corp.* (1959), 6 Wis. 2d 299, 304, 94 N. W. 2d 584, compiles a number of definitions of a tax. A tax is an exaction, usually of money, by the government for the support of government.

In the instant case, no funds are collected by the state, and no funds are disbursed or used for the purposes of government as a consequence of sec. 539. Whatever the nature of the exaction from a landlord here, it is not a tax in the sense that makes the uniformity clause relevant. Hence, the fact, *arguendo*, that the burden of the exaction does not fall uniformly does not mean the legislation is unconstitutional under the uniformity clause.

The most serious challenge to sec. 539 is that it impairs the obligation of contracts contrary to art. I, sec. 10, of the United States Constitution [1] and art. I, sec. 12, of the Wisconsin Constitution. [2]

---

[1] Art. I, sec. 10, provides, in part:

"No state shall enter into any treaty, alliance, or confederation; grant letters of marque and reprisal; coin money; emit bills of credit; make any thing but gold and silver coin a tender in payment of debts; pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts, or grant any title of nobility."

[2] Art. I, sec. 12, provides:

"No bill of attainder, ex post facto law, nor any law impairing the obligation of contracts, shall ever be passed, and no conviction shall work corruption of blood or forfeiture of estate."

Applying these constitutional provisions, this court said in *In re Cranberry Creek Drainage District* (1930), 202 Wis. 64, 68, 231 N. W. 588:

" '[A]n act which in any degree, no matter how slightly, modifies the obligation of the contract by attempting to relieve the one party from any duty by the contract assumed, is repugnant to the constitutional prohibition.' "

In his dissent in *El Paso v. Simmons* (1965), 379 U. S. 497, 523, 85 Sup. Ct. 577, 13 L. Ed. 2d 446, Mr. Justice BLACK quoted Mr. Chief Justice MARSHALL in *Sturges v. Crowninshield* (1819), 17 U. S. (4 Wheat.) 122, 197, 198, 4 L. Ed. 529:

" 'Any law which releases a part of this obligation, must, in the literal sense of the word, impair it. . . .
" 'The words of the constitution, then, are express, and incapable of being misunderstood.' "

Under these interpretations of the contract clause, sec. 539 impairs the obligations of the leases held by the plaintiffs.

Sauk Construction Company, one of the plaintiffs in the action against the secretary of the department of revenue, has a lease with the Wisconsin department of administration which runs from December 1, 1972, to November 30, 1977, at a rental rate of $4,950 a year. The lease provides that the department's rent will increase each year by its proportionate share of the property tax increases over the tax rate of the base year of 1973. That amount is to be recomputed annually.

Longwood Gardens-North, another plaintiff in the action against the department of revenue, has leased an apartment for one year from September 1, 1973, to August 31, 1974. The rent is fixed at $162.50 a month. This lease was contracted on July 10, 1973.

The plaintiffs in the three actions against the department of administration lease properties to that depart-

ment. S. & L. Realty Investment Corp. leased property in Milwaukee for the period from May 1, 1969, to June 30, 1971, giving the department three successive options for two year extensions. The lease is currently under an extension from July 1, 1973, to June 30, 1975. The rent is fixed at $13,650 a year.

The R. H. and E. H. Carpenter partnership leases property in Madison for the period from July 1, 1972, to June 30, 1975, with options to renew for two successive one-year periods. The lease's scale of annually increasing rents requires the department of administration to pay an annual rent of $17,766 for the year from July 1, 1973, to June 30, 1974; and $18,282 for the year from July 1, 1974, to June 30, 1975.

The K. C. Corp. leases property in Milwaukee for the period from July 1, 1973, to June 30, 1975, at an annual rent of $1,920.

Because sec. 539 would require the landlords in these leases to collect less rent than the leases obligate the renters to pay, the enforcement of sec. 539 impairs the contractual obligation on these leases in violation of the United States and Wisconsin Constitutions.

Sec. 539 would not merely affect the remedy to which a party might resort for satisfaction of the contract, but would impair the very consideration that was agreed upon. The lessor would receive less rent than he bargained for.

This court has not been one to stand pat upon the contract clause and to insist that, irrespective of injustices and inequities, there must be "business as usual." In *Kuhl Motor Co. v. Ford Motor Co.* (1955), 270 Wis. 488, 71 N. W. 2d 420, we held that, irrespective of the terms of an automobile dealer's contract, such contract could not be cancelled by a manufacturer without just provocation or without regard to the equities of the franchise holder.

In *Kuhl* the court relied upon legislation that made it clear that the unfair cancellation of a dealer's franchise without considering the dealer's equities was against the public policy of the state. We refused to permit the enforcement of a contractual provision contrary to that public policy.

In *Kuhl,* we cited numerous instances wherein this court and other courts relied upon the reserved police power of the state to preserve and protect the public welfare, even though it meant impinging on rights or privileges which private parties sought to secure by contract. We quoted with approval the language of Mr. Chief Justice HUGHES in his dissent in *Morehead v. New York ex rel. Tipaldo* (1936), 298 U. S. 587, 627, 56 Sup. Ct. 918, 80 L. Ed. 1347, 103 A.L.R. 1445:

" 'We have had frequent occasion to consider the limitations of liberty of contract. While it is highly important to preserve that liberty from arbitrary and capricious interference, it is also necessary to prevent its abuse, as otherwise it could be used to override all public interests and thus in the end destroy the very freedom of opportunity which it is designed to safeguard.' " (P. 502)

We have thus accepted the proposition that the obligation of contract is not an absolute right, but is one that may be obliged to yield to the compelling interest of the public—the exercise of the police power.

The broad parameters of the police power were set forth in *Berman v. Parker* (1954), 348 U. S. 26, 32, 75 Sup. Ct. 98, 99 L. Ed. 27, cited with approval in *Kuhl, supra,* page 501:

" 'Public safety, public health, morality, peace and quiet, law and order—these are some of the more conspicuous examples of the traditional application of the police power to municipal affairs.' "

It is obvious that some facets of the police power highly relevant in sustaining some legislation are unimportant in respect to others. The basic question is what value— of the type cited in *Berman*—is it vital to preserve, and is there some reasonable relationship between the preservation of that value and the method the legislature has employed to preserve it.

In *Chicago & N. W. Ry. v. La Follette* (1969), 43 Wis. 2d 631, 169 N. W. 2d 441, the value to be preserved was safety, and the method the legislature selected to insure safety was the requirement of additional train crew members. In *Chicago & N. W. Ry.* the challenge was to the full-crew law, which required more employees on a train than the railroads considered necessary. This restricted the railroads' freedom to contract for whatever number of employees they thought to be appropriate. We there upheld the legislative judgment that there must be a full crew because, "Safety of the public and of the railroad crew are legitimate concerns of the legislature in the exercise of its police power." (P. 645) We upheld the full-crew law because it was possible to conclude, on a factual basis, that the legislature reasonably could have found that a full crew would contribute to the safety of the public.

In the full-crew case it was necessary for this court to examine the situation sought to be corrected by the legislation and to conclude that a legislature could reasonably have found that the public safety would be enhanced by a full-crew requirement. The interest in public safety overrode the private concerns of the contracting parties. The police power was properly invoked. This applicability of the police power, even in the face of countervailing constitutional rights, is readily apparent once a legitimate police power concern for safety can be attributed to the legislature.

A more difficult situation is posed by the instant case, where it is not clear from the face of the law what interest is sought to be protected and how the particular legislation would serve to protect that interest.

It is undisputable that the enforcement of sec. 539 will impair the obligation of contract.

We said in *Amidzich v. Charter Oak Fire Ins. Co.* (1969), 44 Wis. 2d 45, 170 N. W. 2d 813, that a party cannot be bound to a contract he had not bargained for. But the freedom of contract is not unlimited. Every contract is subject to the law of the state when it is written, and will be subject to a law of the state enacted after the bargain if it is in the public interest, under the police power, to attach subsequent conditions to the contract. It is simplistic to say, as the plaintiffs do, that any state infringement on the right to contract violates the constitution. It is equally simplistic to say, as apparently do the defendants, that any legislation that arguably has some public purpose will override a previously made bargain.

The conditions under which contractual rights can be properly altered or infringed upon by the police power are examined in *Home Building & Loan Asso. v. Blaisdell* (1934), 290 U. S. 398, 54 Sup. Ct. 231, 78 L. Ed. 413.

*Blaisdell* grew out of the serious depression of the early 1930's. Farm and home foreclosures were common. The Minnesota legislature enacted a law which, for the duration of a limited emergency, altered a mortgagee's *remedy* after default. The legislature extended the period of time in which the mortgagor could exercise his right of redemption. This permitted a resident mortgagor to remain in possession, provided that he paid a fair rental value for his occupancy. *Blaisdell* was concerned with a legislative alteration of a remedy.

Nevertheless, the exigency which the United States Supreme Court found necessary to justify even this

limited impairment of a mortgagee's remedy was substantial. The justification was the great depression. The United States Supreme Court relied heavily upon the Minnesota legislature's declaration of purpose incorporated in the moratorium legislation.[3] In addition, the court took judicial notice of the great economic distress occasioned by the depression.

The Minnesota act was to have but a limited duration. The legislature declared that an emergency existed, and that, because of such emergency, mortgagors would be unable to meet their contract obligations and become homeless. The United States Supreme Court relied upon

---

[3] "The preamble and the first section of the Act are as follows:

" 'Whereas, the severe financial and economic depression existing for several years past has resulted in extremely low prices for the products of the farms and the factories, a great amount of unemployment, an almost complete lack of credit for farmers, business men and property owners and a general and extreme stagnation of business, agriculture and industry, and

" 'Whereas, many owners of real property, by reason of said conditions, are unable, and it is believed, will for some time be unable to meet all payments as they come due of taxes, interest and principal of mortgages on their properties and are, therefore, threatened with loss of such properties through mortgage foreclosure and judicial sales thereof, and

" 'Whereas, many such properties have been and are being bid in at mortgage foreclosure and execution sales for prices much below what is believed to be their real values and often for much less than the mortgage or judgment indebtedness, thus entailing deficiency judgments against the mortgage and judgment debtors, and

" 'Whereas, it is believed, and the Legislature of Minnesota hereby declares its belief, that the conditions existing as hereinbefore set forth has created an emergency of such nature that justifies and validates legislation for the extension of the time of redemption from mortgage foreclosure and execution sales and other relief of a like character; and

" 'Whereas, The State of Minnesota possesses the right under its police power to declare a state of emergency to exist . . . .' " *Blaisdell, supra,* page 421.

findings of fact made by the Minnesota Supreme Court that stressed the severe nature of the economic situation, the bank failures, and the homelessness. A concurring opinion of the Minnesota Supreme Court was quoted, which likened the economic depression that necessitated the infringement upon the right to contract to " 'flood, earthquake, or disturbance in nature'." (P. 423) Reference was made to " 'widespread want and suffering' " as the result of the financial depression.

*Blaisdell*, then, accepted the police power intervention into a contractual relationship because the legislation was aimed at safeguarding "vital interests" of the people (p. 434) and the remedy afforded had some reasonable relationship to protecting those interests. The court held that, because of the emergency, the depression, vital interests of the public were at stake, and the means taken to safeguard the vital interests were reasonable because they were temporary, and because mortgagees would be compensated by a fair rental value of their property during the extended period of redemption.

*Blaisdell* relied heavily upon *Block v. Hirsh* (1921), 256 U. S. 135, 41 Sup. Ct. 458, 65 L. Ed. 865, and *Marcus Brown v. Feldman* (1921), 256 U. S. 170, 41 Sup. Ct. 465, 65 L. Ed. 877. Both of these cases involved rent controls during World War I. Controls were sustained during the period of the emergency because the vital interests of the community and its ability to respond to the war emergency were dependent upon adequate housing facilities in New York and Washington, D. C.

A more recent case of the United States Supreme Court highlights the strict requirements of the exigent circumstances necessary to permit the police power abrogation or alteration of a contract. *El Paso v. Simmons* (1965), 379 U. S. 497, 85 Sup. Ct. 577, 13 L. Ed. 2d 446, dealt with a Texas law which, after school lands were sold on credit, altered the time within which defaulting purchasers could make good their defaults. Mr. Justice

WHITE, speaking for the court, said that no primary contractual undertaking of either the buyer or the seller was materially affected by the change of law which barred defaulting purchasers from reinstatement.

Mr. Justice WHITE relied upon *Blaisdell*. He said:

"The *Blaisdell* opinion, which amounted to a comprehensive restatement of the principles underlying the application of the Contract Clause, makes it quite clear that '[n]ot only is the constitutional provision qualified by the measure of control which the State retains over remedial processes, but the State also continues to possess authority to safeguard the vital interests of its people. It does not matter that legislation appropriate to that end "has the result of modifying or abrogating contracts already in effect." *Stephenson v. Binford*, 287 U. S. 251, 276. Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. . . . This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court.' 290 U. S., at 434–435. . . .

"Of course, the power of a State to modify or affect the obligation of contract is not without limit. '[W]hatever is reserved of state power must be consistent with the fair intent .of the constitutional limitation of that power. The reserved power cannot be construed so as to destroy the limitation, nor is the limitation to be construed to destroy the reserved power in its essential aspects. They must be construed in harmony with each other. This principle precludes a construction which would permit the State to adopt as its policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them.' *Blaisdell, supra*, at 439. But we think the objects of the Texas statute make abundantly clear that it impairs no protected right under the Contract Clause." (pp. 508, 509)

*El Paso* turned, then, upon the majority's conclusion that the new statutory period of limitations was not significant, because:

"We do not believe that it can seriously be contended that the buyer was substantially induced to enter into these contracts on the basis of a defeasible right to reinstatement in case of his failure to perform . . . ." (P. 514)

Accordingly, the majority did not see that any significant contract right—a right central to the undertaking —was destroyed.

Mr. Justice BLACK sharply dissented on the basis of *Blaisdell*, stating that *Blaisdell* merely:

"[R]elied on and approved the established distinction between an invalid impairment of a contract's obligation and a valid change in the remedy to enforce it." (P. 524)

He also emphasized that *Blaisdell* was based upon a legislative declaration of an emergency of catastrophic proportions. In his dissent, Mr. Justice BLACK quotes Wright, *The Contract Clause of the Constitution,* discussing *Blaisdell:*

" 'If any advance has been made, it consists in that economic conditions may create an emergency in which a *scrupulously drafted statute* may call upon the police power to grant wide discretion to courts in extending temporary and conditional relief to debtors.' " (Emphasis supplied.) *El Paso,* page 526.

Thus, it appears that thirty years after *Blaisdell,* Mr. Justice WHITE was able to justify the police-power action of the Texas legislature only on the ground that the portion of the contract modified by the legislature was "not the central undertaking." (*El Paso,* p. 514) Despite the fact that there was ample evidence that, in the absence of the new legislation, the Texas land title imbroglio would grow worse, Mr. Justice WHITE and the majority were unable to hold that, because the law was in the public interest, the contract could be set aside. Rather,

the court could only hold that the new law did not really affect the essence of the contract.

None of the cases decided by the United States Supreme Court appear to give the leeway to the state police power that defendants claim the legislature possesses in the face of constitutional prohibitions.

We believe that the view of the state's police power, as taken by the majority in *El Paso* or by Mr. Justice BLACK in his dissent, is unreasonably restrictive of *Blaisdell*. This court adheres to the basic philosophy of *Kuhl, supra,* that an unequivocal legislative declaration of public policy, made either before or after the execution of a contract, becomes a part of that contract if the legislature makes it clear that such is its intention and if it can be determined, either by recitals in the legislation or by judicial notice, that vital public interests will be impaired if the legislation is not given effect and vital interests will be enhanced by enforcement of the legislation.

The vital interest to be served is more apparent in some cases than in others. *Chicago & N. W., supra,* involved physical safety of the public and railroad employees. *Nebbia v. New York* (1934), 291 U. S. 502, 54 Sup. Ct. 505, 74 L. Ed. 940, basically was a matter of public health, although outwardly and importantly, it was concerned with the pricing of milk. *Kuhl, supra,* was concerned with the disparity of bargaining power between a giant automobile manufacturer and a local retailer. The vital interest of the public in the limited alteration of the foreclosure remedy of the mortgage contracts in *Blaisdell* is abundantly clear. The reasonable relationship of safety legislation to the public interest is usually apparent on the face of the legislation or may readily be demonstrated by judicial notice. In the instant case, the vital interest of the public in permitting a

substantial impairment of contract rights is not apparent.

Sec. 539 does more than affect a contracting party's enforcement remedies—it limits and reduces the substantive value of a previously negotiated contract. The impairment of the contract in this case, then, is not limited to a minor change in a contracting party's remedy, as in *Blaisdell* or *El Paso*. Hence, it seems clear that, for the police power of the state of Wisconsin to affect the constitutionally protected right of contract, there should be evidence that the legislation is necessary for the vital interests of the people of the state.

We have not been told what that vital interest of the people is. In *Blaisdell*, families were actually being turned out of their homes because of the depression. In *Blaisdell*, the legislature carefully spelled out that vital interest. The courts did not have to guess. In *El Paso*, the vital interest of the state as a whole in the integrity of land titles was apparent.

We are told by the defendants that to affirm this legislation will grant the equivalent of tax relief to hundreds of thousands of necessitous and deserving tenants. We are also told by the plaintiffs that the affirmations of the act will unjustly grant that relief to all renters of all property—real or personal—to banks which rent computers, and to business and commercial lessees, persons who are not ordinarily objects of the state's special solicitude. We are also told, and of this we can take judicial notice from the plain words of the statute, that the event is triggered not necessarily by revenue sharing but by any reduction of taxes. Thus, if in a locality a school bond issue is finally paid off and taxes reduced, a credit will be due the tenant from his landlord. What is there different about this situation now than there has been in the past when taxes were reduced for similar reasons? What vital interests are now triggered by such

a tax reduction? We have not been told, and the pleadings upon which we must rely are not helpful and the legislation does not speak for itself.

We take judicial notice that a reduction of taxes does not necessarily result in a windfall profit to a landlord. It may merely result in a reduced deficit. We have not been shown that a vital interest of the public will be served by abrogating a lessor's right to receive the rent contracted for, particularly in a period of increasing costs. We take judicial notice of the fact that we are in a period of severe price inflation (13 percent per annum at the latest estimate).

We will presume a constitutional purpose if there is any reasonable basis upon which the legislation can be explained by facts within the knowledge of this court. Those facts can be skeletal in nature and can be apparent from the face of the legislation. We would accept a legislative declaration explaining the purpose to be served by this act, for we presume that such declaration would have been founded upon legislative factfinding. But such facts are totally absent here, and only speculatively can we justify this legislation. Speculation, however, can also lead to conclusions that are contrary to those urged by the defenders of this law. Basically, sec. 539 is an incomplete legislative statement. We are told that, whenever during the period in question the taxes have been reduced, the rents, if the owner is a landlord, must be reduced *pro tanto*. In broad accounting terms, it is easy to say that the price of a product should bear a relationship to the cost of goods sold. Applying a similar rationale in broad equitable terms, if the cost of being a landlord is reduced by virtue of a tax reduction, the price of the rental unit theoretically can be reduced an equal amount and the profit, if any, will remain. This, of course, assumes that all other costs remain unchanged. Other costs, however, have increased.

It is also pointed out that, if the owner of real estate is a manufacturer, a reduction of taxes will reduce the cost of the goods he sells, but he is not obliged to pass that reduced cost along to the ultimate consumer, while a lessor must. This, of course, smacks of the problem of equal protection, but additionally it poses the question of whether it is a matter of vital public concern to pass along a rent reduction to a tenant, if it is not of similar importance to pass along a saving to other consumers.

The defendants conceptualize the tax refund transaction proposed by the legislature as being the expenditure of the government's own tax money for tenants' rent relief. They seem to be saying that the owner is a conduit by which government funds are being disbursed. It is probably true that the state government could—it does so now in relief cases—grant a stipend in some cases for the payment of rent. This may well be a public purpose. But that is not what will happen under sec. 539, ch. 90, Laws of 1973. It is not the government's grant of a stipend; it is the landlord's funds which will be used for the payment. Thus, the problem is not the question of the public purpose of the expenditure of public funds, but the abrogation of a pre-existing contract. The public purpose doctrine as argued by the defendants is not germane to the issue.

The central question remains: What vital purpose is served by depriving the owners here of the rent for which they have bargained? The legislature has not told us, nor have the litigants. We conclude that the present legislation is unconstitutional. Further steps to implement it are enjoined.

A number of additional problems have been posed. We do not deal with them, since the act must fall on the question of impairing the obligation of contracts. We do not foreclose the possibility that a constitutional statute can be drawn which will demonstrate on its face

the exigent circumstances that impel the legislation. A statute that seeks to modify, by the invocation of the police power, a constitutionally guaranteed right, such as the right of contract, should be carefully drawn to show that the use of such power is necessary and exigent and serves a vital purpose of government. While courts are willing to indulge any reasonable presumption to sustain police-power-type legislation, they ought not be asked to speculate or conjure up possible explanations to support a legislative act.

*By the Court.*—Sec. 539, ch. 90, Laws of 1973, is declared to be unconstitutional; injunction granted.