In the Matter of CHICAGO, MADISON & NORTHERN RAILWAY COMPANY, Debtor.

William J. RAMEKER, trustee, Plaintiff,

v.

FEDERAL RAILROAD ADMINISTRATION, Wisconsin Department of Transportation, Pecatonica Rail Transit Commission, and Commercial & Savings Bank of Monroe, Defendants.

Adv. No. 83–0060.

United States Bankruptcy Court, D. Wisconsin.

Jan. 6, 1984.

William J. Rameker, Rick D. Bailey, Murphy, Stolper, Brewster & Desmond, S.C., Madison, Wis., for plaintiff.

Sheree Gowie, Asst. U.S. Atty., Madison, Wis., Jane A. Restani, Alan E. Kleinburd, Dept. of Justice Civil Div., Washington, D.C., for Fed. Railroad Admin.

John N. Kramer, Fennimore, Wis., for Pecatonica Rail Transit.

Philip Peterson, James Thiel, Philip Peterson, Madison, Wis., for Wis. Dept. of Trans.

Gilbert Southwell, III, Madison, Wis., for Commercial & Savings Bank.

Patricia M. Gibeault, Brynelson, Herrick, Gehl & Bucaida, Madison, Wis., for debtor, Chicago, Madison & Northern Ry. Co.

ROBERT D. MARTIN, Bankruptcy Judge.

The present dispute comes to the court on cross motions for summary judgment on questions relating to the ownership of, and security interests in, certain railroad ties which came into the debtor's possession prior to the filing of its chapter 11 case. The essential background, taken from the papers filed in this proceeding, follows.

The Wisconsin Department of Transportation ("WisDOT") acquired a railway corridor and adjoining real estate sometime prior to March 21, 1980. On February 25, 1980, WisDOT entered into a use agreement with the Pecatonica Rail Transit Commission ("PRTC"), which on the same date entered into an operating agreement with the debtor, Chicago, Madison & Northern Railway Company ("CM & N"). Those agreements do not form part of the record.

In February 1980 CM & N borrowed $50,-000.00 from the Commercial & Savings Bank of Monroe ("Bank"), for which it executed a promissory note and granted the Bank a security interest in all CM & N's "equipment, fixtures, inventory, including all goods held for sale ... or to be furnished under contracts of service ... and all proceeds and products of the foregoing, where ever located." The financing statement was filed with the Secretary of State on March 6, 1980. The note was renewed several times through December 26, 1981.

After receiving railway rehabilitation funds from the Federal Railroad Administration ("FRA"), WisDOT entered into a Grant and Operating Agreement ("Grant") with PRTC on August 18, 1980. PRTC in its turn entered into a Short Line Railroad Operating and Rehabilitation Agreement ("Operating Agreement") on the same date with CM & N. Each agreement expressly incorporates the other by reference. The Grant provides for transfer of railroad property to PRTC, obliges PRTC to provide railroad service on the line, and provides for improvements to the property and for a degree of recognition of the respective investments in upgrading by the parties and their agents under certain circumstances. The Operating Agreement between PRTC and CM & N provides for CM & N to operate a railroad on the line and to participate in the maintenance and upgrading of the property. PRTC was to forward an 80% contribution from WisDOT for the costs of the rehabilitation and add an additional 6%, while the remaining 14% of the

cost was to be furnished by CM & N in kind.[1] CM & N is expressly characterized as an independent contractor.[2]

As part of its rehabilitation efforts under the Operating Agreement, CM & N purchased about 20,519 railroad ties; 17,769 of these ties from Koppers Co., Inc. ("Koppers"). Apparently a number of ties were incorporated into the track, and a balance of about 13,000 ties was stored at various points on the line. The ties were paid for in a process whereby Koppers invoiced CM & N, which forwarded its own invoices to PRTC or directly to WisDOT. PRTC invoiced WisDOT which paid 80% of the amount due to PRTC. PRTC then forwarded a check for the 80% WisDOT contribution plus the 6% cash share of PRTC's contribution to CM & N, which was obligated to pay the full cost to Koppers. In other words, CM & N was to contribute 14% of the cost of the ties. Or, at least, had CM & N performed under the agreement, it would have paid 14% of the cost of the ties. In fact, CM & N made one initial payment on the ties, a second partial payment and then failed to make any of the series of further payments that became due. This default led to an action in state court by Koppers against CM & N. The action resulted in a stipulation and a rescheduling of payments.[3] Approximately four of the rescheduled payments were made before CM & N filed its chapter 11 petition.

In February 1982, CM & N notified PRTC that it would be unable to continue operations, and a voluntary termination of its service, followed by the transfer of operations to a new carrier, took place on or about March 1, 1982. On April 15, 1982, CM & N filed under chapter 11 of the Bankruptcy Code. The trustee commenced this adversary proceeding to seek a declaration that the remaining 13,000 ties belonged to the bankruptcy estate. Named as defendants were the FRA, the PRTC, WisDOT, and the Bank.

At a later stage in the proceedings WisDOT claimed a reversionary interest in the ties, on the grounds that they were no longer used for the purpose for which they were intended, and cited WIS.STAT. § 85.08(4m)(c) and (d) (1981–82) as authority for its claim.[4] At a hearing held on May 31,

1. The Operating Agreement, § 4.2, *approved project cost* provides:

   Attached to said agreement between the commission and WisDOT is Attachment I *setting forth the project budget. Included in* this budget are the funding sources. The Commission will receive 80% of the allowable project cost as the project proceeds from WisDOT from funds supplied by FRA and the State of Wisconsin.... The remaining 20% of the allowable project costs is to be furnished by the Commission in cash and the operator in kind in proportions and figures as shown in the project budget. The commission hereby agrees to pay to the operator the funds as received from WisDOT which will be based upon invoices from the operator approved by WisDOT. The payment as received from WisDOT will represent 80% of the funds due the operator at that point for material and labor. The commission agrees *to furnish the remaining 20% at said time* less whatever contribution of value via inkind materials and services would be due from the operator on the particular material and labor involved....

2. Section 13.3—*status of commission's operator* [CM & N]

   Commission's operator (including officers, directors, employees, agents or representatives

thereto) is an independent contractor, and in no way shall it be deemed to be an affiliated, [sic] partner, joint venturer, or associated in any manner whatsoever with WisDOT or Commission.

3. A review of the invoices shows that the total cost of the ties and other material was $432,879.65. The CM & N share was to be $58,577.00, or 13.53% of the total. On the whole project, CM & N was to pay $123,303.00, or 13.95%.

4. WIS.STAT. § 85.08(4m)(c)(6) and (d) (1981–82) provide

   (c) *Railroad facilities acquisition grants.* The department may make grants to eligible applicants for the purpose of purchasing rail property. The grant may be composed of state funds, federal funds, or a combination of state and federal funds. No grant for the acquisition of rail property improvements may exceed 80% of the acquisition cost.... The department shall administer the grant program and shall have all powers necessary and convenient to implement this paragraph and par. (d), including the following powers:

   . . . .

   6. To determine whether rail service is being continued and the required maintenance

1983, WisDOT's motion to dismiss on grounds of lack of jurisdiction was denied, and with the agreement of all parties the court determined to treat the matter as one on motions for summary judgment.

The parties dispute the ownership of the ties, and the validity and extent of the Bank's claimed security interest. The five parties to this action appear to fall into two alignments, the trustee and Bank seeking to show CM & N owned the ties against the three governmental authorities which contend that CM & N had no interest in the ties at the commencement of the bankruptcy case.

The present motion depends upon a resolution of the question of title to the ties. If title to the ties passed to PRTC before the date of filing of the bankruptcy petition on April 15, 1982, then nearly all subsidiary questions are resolved, at least insofar as the court must rule at present. From the undisputed facts alleged in the complaint and answers, or set forth in affidavits and joint statements, it must be concluded that PRTC had acquired full title and possessory rights to all of the ties more than a year before CM & N filed under the Bankruptcy Code. However, a further discussion of the basis for this determination seems justified.

1. *The Claims of FRA and WisDOT.*

■ For all purposes necessary for a decision on this motion, FRA and WisDOT have substantially the same interest. FRA in its amended answer claims an interest in the ties or their value if they are not used as provided under the federal grant to Wis-DOT. WisDOT, for its part, cites WIS.

STAT. § 85.08(4m)(c)(6) and (d) (1981–82) as grounds for its claim that should the ties not be used as provided in the Grant, the ties revert to WisDOT or the complete Grant must be rescinded.

The law in effect when the two contemporaneous agreements (the Grant and the Operating Agreement) were executed on August 18, 1980 was a predecessor to the statute cited by WisDOT. Under WIS. STAT. § 85.08(4m)(c)(4) (1979–80), effective July 29, 1979

> If rail service is not continued ... or if the applicant disposes ... of any of the improvements for which the applicant has obtained a grant under this paragraph, the rail property improvements ... shall revert to the [Wisconsin] [D]epartment [of Transportation].

Every contract executed in Wisconsin is subject to the law in effect at the time of its execution. *State ex rel. Building Owners & Managers Association of Milwaukee, Inc. v. Adamany,* 64 Wis.2d 280, 294, 219 N.W.2d 274 (1974). It is not necessary to determine whether such a vital public interest under the police power exists as to subject the agreement to later modifications in the law. *See Building Owners & Managers Association, supra* at 299, 219 N.W.2d 274.

The state's reversionary claim to the ties should they be used for any purpose other than those provided for in the Grant was thus part of the contract and should be enforced. Since that is the law to be applied, any potential conflict between Wis-DOT and FRA lies outside the scope of this proceeding. In any event, it appears from the record that the ties are currently availa-

or improvement activities are being performed on a rail line for which a grant is made under this paragraph or par. (d). If rail service is discontinued or the grantee disposes of any portion of the rail property for which the grantee obtained a grant under this paragraph or par. (d), and the department does not approve the discontinuance or disposal, then the rail property for which the grant was obtained shall revert to the ownership and control of the department unless the department elects to accept repayment from the grantee of the full amount of all grants received from the department for the line.

(d) *Railroad rehabilitation and construction grants.* The department may make grants to eligible applicants for the purpose of rehabilitating or constructing rail property improvements. Construction shall be limited to that which is required to continue rail service on a particular line or to provide alternative rail service when a line has been abandoned. A grant under this paragraph may be composed of state funds, federal funds, or a combination of state and federal funds. No grant may exceed 80% of the costs of rehabilitation or construction.

ble for use by the grantee, PRTC, in accordance with the terms of the Grant. Only if this court should find that the trustee is entitled to the ties would the reversionary provisions of the statute come into effect, and possibly require that they be turned over to WisDOT. For the reasons stated below, this contingency will not occur.

### 2. Claims of PRTC.

PRTC claims that it has been the owner of the ties at all times material to this case, and that CM & N, the debtor, was not in possession of the ties at the time it filed its chapter 11 petition on April 15, 1982. These claims must be sustained.

The Operating Agreement between PRTC and CM & N provides expressly that CM & N was no more than a contractor for PRTC in carrying out the task of operating a freight railroad and maintaining and upgrading the railroad property.

> CM & N is declared to be an independent contractor, and in no way ... affiliated [or] a partner [or] joint venturer or associated in any way whatsoever with Wis-DOT or the Commission.

Operating Agreement, § 13.3. As a contractor for PRTC, CM & N ordered the ties from Koppers, and passed on the invoices to WisDOT. WisDOT then transmitted 80% of the cost of the ties to PRTC, which forwarded the 80% plus its 6% contribution to CM & N, which was then obligated to add its 14% share and pay the total to Koppers. It is clear from the contract, taken as a whole, that this 14% contribution did not give CM & N a present ownership interest in the property. A contractor or sub-contractor may be an agent for procurement of goods to be installed, or it may at the same time be a middleman, buying the goods and reselling them to its general contractor or property owner. In the present case, CM & N was far more an agent than a middleman: it took no profit on the transaction, and it was to pay for the ties only after it received the full contribution from WisDOT and PRTC.

The financial arrangements of the Operating Agreement are pertinent. Under that agreement, CM & N was to pay PRTC only one dollar per year for each of the first three years of its lease. Only starting with the fourth year was its rental to become more than nominal (a percentage of gross freight revenue with a minimum payment of $10,000.00 per year reduced by certain taxes). Operating Agreement, § 2.0. In this context, the 14% contribution of CM & N in the form of materials and labor emerges as part of the otherwise entirely nominal consideration to be paid by CM & N for its privileges under the Operating Agreement. The rehabilitation project was expected to last no more than five years.

### 3. Claim of the Trustee

It is true that another provision of the agreement recognized a 14% "investment" interest of CM & N in its improvements.[5] But careful reading of the section, in the context of the whole agreement among the parties, shows that this investment interest is to be returned to CM & N only on the occurrence of an as-yet unrealized contingency, the transfer of the property (i.e. the upgraded track and other railroad facilities transferred to PRTC under the Grant) by PRTC to another entity. The most that can be said of such a claim is that it represents an inchoate interest in 13.53% to 13.95% of the value, upon a possible future transfer, of that portion of the total number of ties which were incorporated into the track prior to the termination of service by CM & N on or about March 1, 1980. While the precise number of ties installed cannot be determined from the record, it is no fewer than 4,683 and no more than 7,433.[6] Thus

---

**5.** Section 7.1 of the Grant, incorporated by reference in the Operating Agreement, provides that "to the degree that the commission or a private firm bears the costs of ... upgrading, it will have an investment in the property ... [T]his investment is of no particular consequence to this Grant Agreement unless and until the property is liquidated or transferred to a different owner."

**6.** It is unclear from the record whether approximately 2,750 ties, purchased from a different supplier, were incorporated into the track.

the maximum value of the trustee's claim is $(13.95\%) \times (4683 \leq y \leq 7433) \times$ (value at sale of railroad tie), as discounted by the remoteness of the probability of a future sale.[7]

But even this inchoate claim exists only if the termination of service by CM & N preserved other rights of the debtor and hence of the trustee as its successor. The Operating Agreement provides for a sixty-day grace period during which a party may remain in default, and a further thirty days after notice, to cure, before the agreement terminates of its own force. On the other hand, provisions of the Operating Agreement may be modified or waived "in writing signed by both parties. Consents and approvals . . . and . . . modifications of this instrument may be made or granted by letter . . . or by an exchange of letters between the parties." Section 13.6.

On February 24, 1982, David C. Dickison, then President of CM & N, advised PRTC that continued operation was impossible "because of [CM & N's] cash position," and in effect asked that service be transferred to the Central Wisconsin Railroad. After actual termination of service on March 1, 1982, John F. Jenswold, Chairman of the Board of CM & N, on March 8, 1982, wrote Robert Hoesly, Chairman of PRTC, asking to be relieved of the "obligation to provide service and . . . operating obligations and rights." Mr. Jenswold also requested that "this be without prejudice to any other rights such as the CM & N may have pursuant to such contract."

On March 12, 1982, PRTC adopted a resolution accepting the March 8 notification "as a complete default from the standpoint of continued operations" and accepting "the termination of all obligations beyond March 1, 1982 for any service by CM & N under said contract." The resolution added that

The acceptance of such discontinuance of service and release of further responsibility of service does not affect obligations or rights of either party in the settlement

of other matters arising under the contract.

The court has received three affidavits seeking to assist the construction of this termination agreement. Mr. Jenswold, still an officer of CM & N, stresses the "reservation of rights" language of his request and asserts that at the March 12 meeting of the PRTC leading to the resolution he waived no provisions of the Operating Agreement, but rather hoped that after reorganization CM & N could return to service on the Janesville-Mineral Point line, and that he never voluntarily surrendered possession of the ties. Paul C. Heitmann, Director of the Bureau of Railroads and Harbors in WisDOT states by affidavit that in meetings just prior to the termination of service, Dr. Dickison, then President of CM & N, was emphatic in stating that CM & N "had no intention of attempting to reestablish itself as operator of the line." Mr. Heitmann further states that he was present at the March 12 meeting, heard Mr. Jenswold's representations to PRTC, and believed they were consistent with a final termination of the Operating Agreement. David Dickison, first Treasurer and then President of CM & N, states by affidavit that CM & N did not expect to resume operations after its replacement, and that all possession and control of the rail properties were surrendered by CM & N to PRTC on March 1, 1982. He also states that he is now an employee of the Chicago and Western Railroad, the replacement carrier on the line.

Giving appropriate weight to the divergent loyalties of these three affiants and excluding such portions of their affidavits as are inappropriate for consideration, the court can conclude from their affidavits and the relevant documents that as of March 12, 1982 none of the parties seriously anticipated a resumption of service or rehabilitation operations by CM & N. On the other hand, the documents speak for themselves and are consistent as to the reservation of other rights. One of these reserved rights was

---

**7.** Even in the event of a future sale, § 8.10 of the Grant grants priority to liquidation or transfer expenses and to federal claims. The result is that under almost any foreseeable circumstances, the value to the estate of this claim is inconsequential.

the potential claim by CM & N to the ties already incorporated, and it is this claim, in accordance with the formula set forth above, which is property of the estate, but of plainly inconsequential present value.

#### 4. Claim of the Bank.

■ Counsel for the Bank has ably argued for the validity of the Bank's claimed security interest in the ties. It is elementary, however, that a security interest attaches to property only when the debtor has rights in the collateral. WIS.STAT. § 409.-203(1)(c). In this state and circuit, a possessory interest for such a limited purpose as repair of property does not constitute rights in the collateral. *Chrysler Corp. v. Adamatic, Inc.,* 59 Wis.2d 219, 235, 208 N.W.2d 97 (1973); *In Re Pubs, Inc. of Champaign,* 618 F.2d 432, 436–439 (7th Cir.1980) (for valid security interest, true owner must either agree to the creation of the security interest or be estopped from denying the creation or existence of the interest). There can be no question of estoppel here because the claimed security interest was created before the Grant and Operating Agreements were executed, and CM & N is expressly precluded from using the property as collateral. Grant § 4.3 incorporated by reference into Operating Agreement, § 13.13. *But cf. Kinetics Technology International Corp. v. Fourth National Bank of Tulsa,* 705 F.2d 396, 399–400 (10th Cir.1983). In general, the true owner (here PRTC) must authorize the debtor to encumber the property for a valid security interest to attach. *Val-U Construction Co. of South Dakota, Inc. v. Contractors, Inc.,* 213 Neb. 291, 328 N.W.2d 774, 35 U.C.C.Rep. 1299, 1302 (1983). Such authority, of course, was expressly denied under the Operating Agreement. Since CM & N had no ownership rights in the collateral, but was in possession of the ties only for the limited purpose of using the ties in maintenance and rehabilitation of the track, the Bank's security interest never attached to these ties.

Even if an alternative theory were applied, under which the debtor was a purchaser of the ties and "resold" them (at a 14% loss) to PRTC, the Bank's claim would nonetheless fail, since the security agreement executed by the debtor and the Bank expressly allowed for the sale of inventory at least so long as CM & N was not in default under the note, a condition not pleaded as of the transfer of the ties to PRTC, and not apparent from the record. In such a case, the security interest, if it had attached, would continue only in the proceeds. *See* WIS.STAT. § 409.306(2).[8] But § 409.306(4), governing rights in proceeds in insolvency proceedings limits such an interest, for all practical purposes, to proceeds received by CM & N within the ten days prior to its filing for bankruptcy on April 15, 1982—a date many months after PRTC made final payment on the ties, unless the proceeds were retained in a separate account, a fact again neither pleaded nor apparent. *See In Re San Juan Packers, Inc.,* 696 F.2d 707, 711 (9th Cir.1983).

■ Upon the foregoing analysis it is apparent that PRTC was the legal owner of the ties at all times material to this case. The debtor's possession was for a limited purpose and gave it no right to encumber the collateral. The debtor was no longer in possession of the ties at the time it filed its bankruptcy petition. Additionally, the ties are impressed with a legal restriction on their disposition such that they could not become property of the estate in any sense unless the debtor railroad were actively engaged in the maintenance and repair of the Janesville-Mineral Point railway line, which it was not at the time of filing. Finally, the trustee's interest in the ties is limited to a potential claim valued in accordance with the formula set forth in this discussion. For practical purposes, the value of this claim is negligible and inconsequential.

Upon the findings and conclusions set out in this opinion summary judgment may be

---

**8.** It is not argued that the security interest was not properly perfected by a fixture filing in regard to a transmitting utility. *See* WIS. STATS. §§ 409.313(1)(b), 409.402(1)(b), 409.-402(5).

granted in favor of the Pecatonica Rail Transit Commission. The claims of all other parties may be dismissed.