FRED A. RISSER, Chairperson Senate Organization Committee
The Committee on Senate Organization has requested my opinion on a number of questions relating to the various accounts of the Fixed Retirement Trust of the Wisconsin Retirement System (WRS).
Your first question asks:
 1. Is there any constitutional or contractual rights bar which would prevent the Legislature from directing that an amount equal to the WRS unfunded liability be deducted from the Transaction Amortization Account (TAA) established under s. 40.04 (3) and credited to the employer accumulation reserve under s. 40.04 (5) to eliminate the WRS unfunded liability?
It is my opinion that such a statutory change could cause a violation of contract rights of some members of the WRS. Since the contractual rights of the various WRS participants (actives and annuitants) are not uniform, a general statement as to the rights of all participants is inappropriate in answering your questions. No specific legislation has been provided and the potential or actual monetary effect of such legislation on individual participants is not available to me.
The WRS unfunded actuarial liability as of the end of 1988 was $1,374,297,000. See Wisconsin Department of Employe Trust Funds 1985-87 Biennial Report Summary dated March 1989 at 5. This unfunded actuarial liability results primarily from legislated system benefit increases which are not paid for at the time enacted and from unfunded prior service liability of participating employers who do not pay costs of prior service on *Page 199 
the date of initial participation. See Joint Survey Committee on Retirement Systems Report on 1983 Senate Bill 568 at 4 (ACTUARIALEFFECT) and section 40.05 (2)(b), Stats.
The Transaction Amortization Account (TAA) was established to record all gains, losses, premiums, discounts, forfeitures and penalties in the WRS fixed retirement trust. See 1988 State of Wisconsin Investment Board Annual Report, 36, Note H. Section25.17 (14)(f) (as amended by 1989 Wisconsin Act 13) states regarding valuation of WRS securities invested by the Investment Board that:
 [T]he amount of any . . . gain or loss at time of sale or other disposition, premium on call or redemption, commitment or standby fee, profit or loss on residual value, scrap value, fire or casualty award, condemnation award, adjustment in book value, or other gains or losses shall be transferred to the transaction amortization account of the fixed retirement investment trust under s. 40.04 (3).
As of March 31, 1989, the TAA had a positive balance of $2,624,978,325.61. (See April 20, 1989, Investment Board report on Transaction Amortization Account.)
Your question is based on hypothetical legislation which would deduct the amount of the unfunded actuarial liability from the TAA and credit that amount to the employer accumulation reserve. This would be contrary to the present statutory procedure whereby distributions from the TAA are divided among the employe accumulation reserve, employer accumulation reserve and annuity reserve. Sec. 40.04 (3)(a), (4), (5) and (6), Stats. The potential effect of such hypothetical legislation on active members and annuitants of the WRS could be as follows:
 a. Annuitants would not benefit from the transfer but such lessening of the TAA balance would tend to substantially lower or eliminate surplus dividends to annuitants now available under the statutes. *Page 200 
 b. Certain active employes would sustain a potential lessening of the value of the purchase money annuity option at retirement since their employe accumulation reserve accounts would not be credited with a portion of the TAA by way of the current income account as occurs under the present statutes.
 c. Active employes could sustain an increased danger of higher employe contributions because of a lessening of the transaction amortization balance to a point where unfavorable market experience would completely deplete such account and cause trust fund shortages that would have to be replaced by increased employe and employer contributions.
Additional bases for objection based on unconstitutionality can also arise from the specific legislation drafted.
Article I, section 10, clause 1 of the United States Constitution states that "[n]o state shall . . . pass any . . . law impairing the obligation of contracts . . . ." Similarly, article I, section 12 of the Wisconsin Constitution states that "[n]o bill of attainder, ex post facto law, nor any law impairing the obligation of contracts, shall ever be passed . . ." "All laws are presumed to be constitutional. In order to overcome this presumption [one attacking a statute] . . . must prove . . . [it] unconstitutional beyond a reasonable doubt." State ex rel. Cannonv. Moran, 111 Wis.2d 544, 552-53, 331 N.W.2d 369 (1983).
As the court stated in Cannon, 111 Wis.2d at 554, "[t]he first step in analyzing a contract clause problem is to determine whether an obligation of contract has been impaired." A contract is impaired when the rights and obligations of the parties to that contract, which arise by virtue of that contract, are altered by legislation. Home Building Loan Association v.Blaisdell, 290 U.S. 398, 431 (1934). *Page 201 
Section 40.04 which controls the distribution of earnings, profits or losses of the fixed retirement investment trust provides in part (as amended by 1989 Wisconsin Act 13):
 (3) A fixed retirement investment trust and a variable retirement investment trust shall be maintained within the fund under the jurisdiction and management of the investment board for the purpose of managing the investments of the retirement reserve accounts and of any other accounts of the fund as determined by the board, including the accounts of separate retirement systems. Within the fixed retirement investment trust there shall be maintained a transaction amortization account and a current income account, and any other accounts as are established by the board or the investment board . . . .
 (a) All earnings, profits or losses of the fixed retirement investment trust and the net gain or loss of the variable retirement investment trust shall be distributed annually on December 31 to each participating account in the same ratio as each account's average daily balance within the respective trust bears to the total average daily balance of all participating accounts in that trust. For the fixed retirement investment trust the amount to be distributed shall be the then balance of the current income account plus 20% of the then balance of the transaction amortization account . . . .
. . . .
 (4)(a) An employe accumulation reserve, within which a separate account shall be maintained for each participant, shall be maintained within the fund and:
 1. Credited with all employe contributions made under s. 40.05 (1) and all employer additional contributions made under s. 40.05 (2) (g) and all contribution accumulations reestablished under s. 40.26 or 40.63 (10). *Page 202 
 2. Credited as of each December 31 with interest on the prior year's closing balance at the effective rate on all employe required contribution accumulations in the variable annuity division, on all employe required contributions in the fixed annuity division on December 31, 1984, on all employe required contributions in the fixed annuity division of participants who are not participating employes after December 31, 1984, and on all employe and employer additional contribution accumulations and with interest on the prior year's closing balance at the assumed benefit rate on all employe required contribution accumulations in the fixed annuity division for participants who are participating employes after December 31, 1984.
 (5) An employer accumulation reserve shall be maintained within the fund to which, without regard to the identity of the individual employer, shall be:
(a) Credited all employer required contributions.
 (b) Credited, as of each December 31, all fixed annuity division interest not credited to other accounts and reserves under this section.
 (6) An annuity reserve shall be maintained within the fund to which shall be transferred amounts equal to the present value as of the date of commencement of annuities granted under this chapter. The reserve shall be increased by investment earnings at the effective rate and shall be reduced by the aggregate amount of annuity payments and death benefits paid with respect to the annuities and by the present value at the date of termination of annuities terminated in accordance with s. 40.08 (3), 40.26
or 40.63 (9) (c).
 "Effective rate" is defined at section 40.02(23)(a) in part as:
 For the fixed annuity division, the rate, . . . determined by dividing the remaining fixed annuity division investment earnings for the calendar year or part of the calendar year, after making provision for any necessary reserves and after *Page 203 
deducting prorated interest and the administrative costs of the fixed annuity division for the year, by the fixed annuity division balance at the beginning of the calendar year as adjusted for benefit payments and refunds paid during the year excluding prorated interest.
"Assumed benefit rate" as used in section 40.04(4)(a)2. is defined at section 40.02(6) as follows:
 "Assumed benefit rate" means a rate of 5%. The assumed benefit rate shall be used for calculating reserve transfers at the time of retirement, making actuarial valuations of annuities in force, determining the amount of lump-sum death benefits payable from the portion of an annuity based on additional deposits and crediting interest to employe required contribution accumulations.
Fixed annuity reserve surpluses are distributed under the authority of section 40.27(2) which provides:
 (2) FIXED ANNUITY RESERVE SURPLUS DISTRIBUTIONS. Surpluses in the fixed annuity reserve established under s. 40.04(6) and (7) shall be distributed by the board if the distribution will result in at least a 2% increase in the amount of annuities in force, on recommendation of the actuary, as follows:
 (a) The distributions shall be expressed as percentage increases in the amount of the monthly annuity in force, including prior distributions of surpluses but not including any amount paid from funds other than the fixed annuity reserve fund, preceding the effective date of the distribution. For purposes of this subsection, annuities in force include any disability annuity suspended because the earnings limitation had been exceeded by that annuitant in that year.
 (b) Different percentages may be applied to annuities with different effective dates as may be determined to be equitable but no other distinction may be made among the *Page 204 
various types of annuities payable from the fixed annuity reserve.
 (c) The distributions shall not be offset against any other benefit being received but shall be paid in full, nor shall any other benefit being received be reduced by the distributions. The annuity reserve surplus distributions authorized under this subsection may be revoked by the board in part or in total as to future payments upon recommendation of the actuary if a deficit occurs in the fixed annuity reserves.
Under the hypothetical legislation, the amount of the unfunded actuarial liability is deducted from the TAA and credited to the employer reserve. This conflicts with contractual rights granted under the present statutes requiring division of any TAA distribution between the employer, employe and annuity reserves. Sec. 40.04(3)(a), Stats. Rights of those annuitants who retired before the effective date of such legislation would be impaired to the extent that no portion of those TAA monies would be available to increase annuities. A secondary detrimental effect occurs in that less money would be available in the future to fund the annuity increases provided by section 40.27(2). Annuitants have a contractual right, based on service already performed, in the existing benefit improvement mechanism set forth in section 40.27(2) which would be infringed by the hypothetical legislation. Active WRS participants have similar contractual rights during employment.
An active or retired WRS participant has, under case law, no vested right to retirement benefits "[i]n the absence of contractual relations or a specific declaration by the legislative body creating a vested right." State ex rel. McCartyv. Gantter, 240 Wis. 548, 555, 4 N.W.2d 153 (1942). Whatever rights are established contractually or by statute are determined as they exist at the time of retirement. State ex rel. Smith v.Annuity Pension Board, 241 Wis. 625, 629, 6 N.W.2d 676 (1942).State Teachers' Retirement Board v. Giessel, 12 Wis.2d 5, 10,106 N.W.2d 301 *Page 205 
(1960), held that the contractual rights included the right to earnings (the teachers' retirement system was a money-purchase benefit system in 1960). No later Wisconsin case negates the concept that vested rights are set at retirement unless affected by a statute providing greater or lesser rights. Such greater rights are granted by section 40.19(1).
Section 40.19(1) provides for vesting of rights during employment by stating:
 Rights exercised and benefits accrued to an employe under this chapter for service rendered shall be due as a contractual right and shall not be abrogated by any subsequent legislative act. The right of the state to amend or repeal, by enactment of statutory changes, all or any part of this chapter at any time, however, is reserved by the state and there shall be no right to further accrual of benefits nor to future exercise of rights for service rendered after the effective date of any amendment or repeal deleting the statutory authorization for the benefits or rights. This section shall not be interpreted as preventing the state from requiring forfeiture of specific rights and benefits as a condition for receiving subsequently enacted rights and benefits of equal or greater value to the participant.
One of the "benefits accrued to an employe under this chapter for service rendered," denominated as a contractual right, is the section 40.27(2) right to fixed annuity reserve surplus distributions caused by augmented TAA transfers. Similar statutory contractual guarantees are provided to participants who participated prior to specific dates. See sec. 40.19(2), (2m) and (3), Stats. It, therefore, appears that various WRS participants have vested rights to annuity improvement, through use of TAA monies, that would be infringed by crediting a substantial portion of those monies solely to the employer accumulation reserve to eliminate the unfunded actuarial liability. Since various degrees of impairment would exist, I now consider whether such impairments are unconstitutional. *Page 206 
As stated in Cannon, 111 Wis.2d at 558:
 The degree of impairment determines the level of scrutiny to which the legislation in question will be subjected. In, Allied Structural Steel Co. v. Spannaus, 438 U.S. at 244-45, the court stated:
 "[T]he first inquiry must be whether the state law has, in fact, operated as a substantial impairment of a contractual relationship. The severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation." (Footnotes omitted.)
 In finding that an impairment was severe, the Spannaus court relied upon those "factors that reflect the high value the Framers placed on the protection of private contracts." Id. at 245. In particular, the court noted that the legislation in question nullified an express term of the contract which was bargained for and reasonably relied upon by the parties, resulting in a completely unexpected liability to the plaintiff.
The magnitude of the transfer itself indicates that the impairment is substantial. While there are no facts stated in your letter, relating to the actual potential effect on annuitants, I can roughly interpolate such effect from my opinion to Gary I. Gates, Secretary of the Department of Employe Trust Funds, relating to the pre-1974 retiree supplemental benefit payments from the annuity reserve. 76 Op. Att'y Gen. 299 (1987). Pursuant to that opinion request, I was advised that a $230 million transfer from the TAA to the employe, employer and annuity reserves would cause an approximate two percent increase in existing annuities. 76 Op. Att'y Gen. at 308. The transfer which is the subject of this question is in the amount of $1.47 billion, more than six times the amount in that opinion. The resulting potential effect on existing annuities, in the nature of more than twelve percent, appears to be a substantial impairment. *Page 207 
I have no actuarial studies or facts of any other nature upon which to base a determination of the degree of potential contract impairment resulting from the lessening of the value of the purchase money annuity option to active employes. Nor do I have any basis upon which to determine the likelihood of higher employe contributions as a result of the TAA transfer to pay the unfunded liability. It is clear, however, that 1989 Wisconsin Act 13
at section 18 makes employe contributions responsible for any increase in contributions required because of benefit improvements in that act. For any future contribution rate increases required by the system, not caused by1989 Wisconsin Act 13, employe contribution increases must provide half. See section 40.05(2n) as created by section 18 of1989 Wisconsin Act 13. While the magnitude of the effect on the money purchase option and employe contributions is not available to me, it appears that the effect of the impairment in these two areas could also be substantial. Since I find a substantial impairment, it is necessary to next inquire into the nature and scope of the legislation to determine if it is proscribed by the contract clause. Cannon, 111 Wis.2d at 558.
As further stated in Cannon, 111 Wis.2d at 559-60:
 As noted earlier, the contract clause does not proscribe every impairment of contract. A state may be entitled to exercise its police power for the general welfare of the public even though a private contract is impaired. Wipperfurth v. U-Haul Co. of Western Wis., Inc., 101 Wis.2d 586, 592, 304 N.W.2d 767 (1981). "If the Contract Clause is to retain any meaning at all, however, it must be understood to impose some limits upon the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power." Allied Structural Steel Co. v. Spannaus, 438 U.S. at 242. (Emphasis in original.)
 In Home Building Loan Assn. v. Blaisdell, 290 U.S. at 434, the United States Supreme Court upheld a Minnesota *Page 208 
mortgage moratorium statute which was designed to reduce the number of foreclosures during the economic depression of the 1930's. This statute impaired the contract rights of lenders. Nevertheless, the court balanced the language of the contract clause against the purpose of the statute and held that the state had authority "to safeguard the vital interests of its people" through such legislation. In reaching this conclusion, the court found five factors to be significant. In Allied Structural Steel Co. v. Spannaus, 438 U.S. at 242 (citations omitted), the court succinctly set forth these five factors as follows:
 "First, the state legislature had declared in the Act itself that an emergency need for the protection of homeowners existed. Second, the state law was enacted to protect a basic societal interest, not a favored group. Third, the relief was appropriately tailored to the emergency that it was designed to meet. Fourth, the imposed conditions were reasonable. And, finally, the legislation was limited to the duration of the emergency."
 Blaisdell indicates that to survive the contract clause a statute which impairs contracts must have a significant and legitimate public purpose, "such as the remedying of a broad and general social or economic problem." Energy Reserves Group, Inc. v. Kansas Power and Light Co., 51 U.S.L.W. 4106, 4109 (U.S. Jan. 25, 1983) (No. 81-1370), State ex rel. Building Owners v. Adamany, 64 Wis.2d at 303. Since Blaisdell, however, the standard has been modified so that the public purpose need no longer involve an emergency or temporary situation. Energy Reserves Group, Inc. v. Kansas Power and Light Co., supra at 4109.
State ex rel. Bldg. Owners v. Adamany, 64 Wis.2d 280, 300,219 N.W.2d 274 (1974), cited in Cannon, stated that legislation impairing the right of contract must show that it "is necessary for the vital interests of the people of the state." Those vital interests must be shown by the legislation itself. State ex rel.Bldg. *Page 209 Owners v. Adamany, 64 Wis.2d at 300-01. Is the existence of the present level of WRS unfunded actuarial accrued liabilities a "general social or economic problem" that requires a remedy "necessary for the vital interests of the people of the state," which remedy involves infringement of contractual rights? Such a problem, if it exists, is not apparent.
Gabriel, Roeder, Smith Company, the WRS actuary, stated as follows in a September 22, 1988, letter to Gary I. Gates, Executive Secretary of the WRS:
 If "actuarial accrued liabilities" at any time exceed the system's accrued assets, the difference is "unfunded actuarial accrued liabilities". This is the common condition. If the plan's assets equalled the plan's "actuarial accrued liabilities", the plan would be termed "fully funded". This is an unusual condition.
. . . .
 The existence of unfunded actuarial accrued liabilities is not bad, but the changes from year to year in amount of unfunded actuarial accrued liabilities are important — "bad" or "good" or somewhere in between.
 Nor are unfunded actuarial accrued liabilities a bill payable immediately, but it is important that policy-makers prevent the amount from becoming unreasonably high and it is vital for a plan to have a sound financial plan for making payments toward them so that they are controlled. WRS has such a financial plan in place and is in excellent condition in accordance with its fundamental financial objective of paying for promised benefits by means of level percent of payroll contributions.
No facts are provided in or with your opinion request that indicate exigent circumstances that compel use of the TAA to pay the unfunded actuarial accrued liabilities.
 A statute that seeks to modify, by the invocation of the police power, a constitutionally guaranteed right, such as the *Page 210 
right of contract, should be carefully drawn to show that the use of such power is necessary and exigent and serves a vital purpose of government. While courts are willing to indulge any reasonable presumption to sustain police-power-type legislation, they ought not be asked to speculate or conjure up possible explanations to support a legislative act.
State ex rel. Bldg. Owners v. Adamany, 64 Wis.2d at 303. It is, therefore, my opinion that lacking any showing of exigent circumstances that require a remedy necessary to protect the vital interests of the state, the TAA transfer suggested in your first question would be violative of the contract clauses of the United States and Wisconsin Constitutions.
Your next question is:
 2. Same as Question (1) except the amount transferred would be used to reduce the present employer-required current service contribution rate?
It is my opinion that a similar violation of contract rights would occur if the amount transferred from the TAA were transferred to reduce required employer current service contributions required by section 40.05(2).
Section 40.05(2) states in part (as amended by1989 Wisconsin Act 13):
 (a) Each participating employer shall make contributions for current service determined as a percentage of the earnings of each participating employe, determined as though all employes of all participating employers were employes of a single employer, but with a separate percentage rate determined for the employe occupational categories specified under s. 40.23(2m). A separate percentage shall also be determined for subcategories within each category determined by the department to be necessary for equity among employers. *Page 211 
 (am) The percentage of earnings under par. (a) shall be determined on the basis of the information available at the time the determinations are made and on the assumptions the actuary recommends and the board approves by dividing the amount determined by subtracting from the then present value of all future benefits to be paid or purchased from the employer accumulation reserve on behalf of the then participants the amount then credited to the reserve for the benefit of the members and the present value of future unfunded prior service liability contributions of the employers under par. (b) by the present value of the prospective future compensation of all participants.
This hypothetical legislation would transfer approximately $1,374,297,000 (the amount of the unfunded actuarial liability) to the employer accumulation reserve to reduce the present employer-required current service contribution rate. The projected employer contributions for year 1988, the most recent available, is in the amount of $380,052,738. See Wisconsin Department of Employe Trust Funds 1985-87 Biennial Report Summary dated March 1989 at 3. It appears that by virtue of the required-computation language of section 40.05(2)(am), the crediting of the amount of the unfunded actuarial liability to the employer accumulation reserve would fully fund the employer contribution for more than three and one-half years. The period would exceed three and one-half years since the $380,052,738 includes prior service liabilities and your question relates only to payment of "current service contributions." During that period of time all employer contributions would be paid by this TAA transfer.
Since your question does not propose payment from the TAA of unfunded prior service liability, I need not consider the question of constitutionality of unequal treatment between participating employers who have prepaid their prior service costs and those who have elected to amortize prior service costs into the future. Sec. 40.05(2)(b), (bg), (bm) and (br), Stats. My *Page 212 
opinion regarding the constitutionality of a proposed statute, as described in your second question, is, therefore, based on the effects on contractual rights of annuitants and active employes similar to those discussed in answering your first question.
A transfer of TAA monies in the amount of the unfunded actuarial liability would have the same effect on active employes and annuitants regardless of whether it is credited to the unfunded actuarial liability or to the employer annuity reserve (with the purpose of reducing employer-required current service contributions). Annuitants would not benefit from the transfer but would sustain substantially lower potential for annuity increases from favorable investment experience. Active employes would sustain a reduced value of the purchase money annuity option at retirement and an increased danger of higher employe contributions.
Similar to question one, these potential violations of contractual rights appear to be substantial and not based upon a showing by the Legislature of exigent circumstances that require this remedy to protect the vital interests of the state. The proposed legislation described by your second question would, therefore, appear to violate the contract clauses of the United States and Wisconsin Constitutions.
Your next four questions are interrelated to the extent that they are properly answered together. Those questions state as follows:
 3. If you conclude that the actions suggested under Questions (1) and (2) are not possible, is there any constitutional or contractual right bar which would prevent the Legislature from directing that the full balance in the TAA be distributed in the same manner as the current annual distribution of investment earnings to the employer, employe and the annuity reserves under s. 40.04 (4), (5) and (6) with the amount credited to the employer accumulation reserve being used to reduce the WRS unfunded liability? *Page 213 
 4. Same as Question (3) except the amount credited to the employer accumulation reserve would be used to reduce the present employer-required current service contribution rate.
 5. Same as Question (4) plus using the amounts credited to the employe accumulation reserve to reduce the employe-required contribution rate.
 6. Same as Question (5) plus directing that the amounts credited to the annuity reserve be placed in a contingency reserve to offset any future adverse actuarial experience with a simultaneous temporary increase in the assumed benefit rate to 10%. The change in the required reserve amount due to the new assumed benefit rate would also be placed in the contingency reserve. The assumed benefit rate would revert to 5% when and if the contingency reserve had been reduced to the level that would leave no surplus at the 5% rate. I understand that the effect of the change in the assumed benefit rate would be a significant reduction in future required transfers from the employer reserve to the annuity reserve and therefore a reduction in employer costs (plus much smaller "dividends" increasing annuities under s. 40.27).
Distribution of the entire TAA to the employer accumulation, employe accumulation and annuity reserves would obviate the potential violations of constitutional rights discussed under questions 1 and 2. Since the TAA monies would be divided between the three accounts in proportion to each account balance (section40.04(3)(a)) employers, employes and annuitants would benefit from the TAA transfer. Annuitants would potentially receive increased annuities from the transfer and the additional monies in the employe accumulation reserve would provide the potential for an increased money purchase option value and lessen the potential for increased employe contributions. This result would occur regardless of whether the TAA portion *Page 214 
credited to the employer accumulation reserve is used to reduce the WRS unfunded actuarial liability (question 3) or the employer-required current service contribution rate (question 4).
Inasmuch as the proposed statutes described under questions 3 and 4 would not impair the contractual rights of WRS participants, they would be constitutional. Any such proposed legislation which affects a change in the employer or employe contribution rate, however, would have to mesh with newly enacted section 40.05(2n), which requires that any increase or decrease in contribution rates be split between employer contributions and employe benefit adjustment contributions. 1989 Wisconsin Act 13, section 18.
Legislation mandating use of the TAA portion credited to the employe accumulation reserve to reduce the employe-required contribution rate (question 5) could be subject to objection on constitutional grounds since an active WRS participant could potentially be negatively affected.
A separate account is maintained within the employe accumulation reserve for each employe, which account is credited with all employe contributions (whether made by the employe or by the employer on the employe's behalf), plus interest from investment earnings. Sec. 40.04(4)(a), Stats. Employe-required contributions that are paid by the employer on the employe's behalf are the property of the employe. As stated at section40.05(1)(b):
 In lieu of employe payment, the employer may pay all or part of the contributions required by par (a) [required employe contributions], but all the payments shall be available for benefit purposes to the same extent as required contributions deducted from earnings of participating employes.
Using the accelerated TAA distribution pass-through to the employe accumulation reserve as the basis to reduce employe-required contributions would lessen the value of employe *Page 215 
accounts. In most cases, the collective bargaining agreements, policies or section 40.05(1)(b) have committed the employer to pay employe contributions. The TAA monies thus used to lower employe contributions do not increase the various employe accounts since those contributions are already employer obligations. Loss of the benefit of increased interest crediting, which presently occurs if the TAA distribution is credited to the current income account (section 40.04(3)(a)), would lower the value of the purchase money option and separation benefit (for post-January 1, 1982, WRS participants). While it appears that the present level of employer-paid employe contributions can be changed without violating contractual rights, it does not follow that the TAA can be used for that purpose.
Using the TAA — generated increase to lower employe contributions, rather than crediting the individual accounts with interest from those monies, would thus potentially impair contract rights. Sec. 40.19(1), Stats. Whether the impairment is substantial enough to constitute a violation of constitutional prohibitions cannot be determined without facts indicating the magnitude of the effect on individual employes. Moreover, the section 40.19(1) grant of contract rights allows the state to require "forfeiture of specific rights and benefits as a condition for receiving subsequently enacted rights and benefits of equal or greater value to the participant." Legislation using TAA monies to reduce employe contributions could contain other benefits ameliorating any potential contract infringement. The facts provided are, therefore, insufficient to enable me to determine whether proposed legislation described in question 5 would or would not violate the contract clauses of the United States and Wisconsin Constitutions.
Then you ask (question 6) whether there is any constitutional problem if legislation were enacted which provided that the TAA monies credited to the annuity reserve were placed in a newly-created contingency reserve (maintained to offset any future negative investment experience) and not paid out as increased *Page 216 
annuities under the present section 40.27(2) surplus distribution procedure. In addition, this legislation would raise the "assumed benefit rate," (for determining the present value of the transfer from the employe and employer accumulation reserves to the annuity reserve on commencement of an annuity) from five percent to ten percent. The employer accumulation account present value transfer would, however, be based upon the five percent rate with the difference also going into the newly-created contingency reserve. This contingency reserve would fund possible annual losses in the annuity reserve resulting from unfavorable investment experience and costs resulting from lower than expected mortality. When and if this contingency reserve were reduced by unfavorable investment and mortality experience, from ten percent to the level that would leave no surplus at a five percent assumed benefit rate, that rate would revert to five percent.
When a WRS participant applies for a retirement annuity, there is transferred to the annuity reserve "amounts equal to the present value [of the annuity] as of the date of commencement." Sec. 40.04(6), Stats. The "assumed benefit rate" (assumed rate of return on investment) used to determine such present value is statutorily established at five percent. Sec. 40.02(6), Stats. Whatever balance the annuitant has in the employe accumulation reserve is credited to the annuity reserve. Sec. 40.04(4)(a)3., Stats. The remaining balance necessary to fund the present value after deducting the annuitant's employe accumulations reserve account is transferred from the employer accumulation reserve. Sec. 40.04(5)(c), Stats. Thus, raising the interest assumption to ten percent would cause a significant reduction in the amount of the transfer from the employer accumulation reserve and of future employer costs as suggested in question 6. This effect would not occur under the described legislation, however, since you specify that "[t]he change in the required reserve amount due to the new assumed benefit rate would also be placed in the contingency reserve." There would be no saving to the employer accumulation *Page 217 
reserve, from raising the assumed benefit rate, since the difference in present value would still be transferred to the contingency reserve of the annuity reserve.
You also suggest (question 6) that creation of the contingency reserve would cause "much smaller `dividends' increasing annuities under s. 40.27." Whether the hypothetical legislation would have this effect would depend on the wording of the legislation. Section 40.27(2) in its present form provides that "[s]urpluses in the fixed annuity reserve shall be distributed by the board if the distribution will result in at least a two percent increase in the amount of annuities in force, on recommendation of the actuary." A contingency fund has thus been statutorily created to the extent of up to two percent of the amount of annuities in force. Question 6 does not specify the point at which the newly-created contingency reserve would be used. Therefore, all that can be said with any degree of certainty is that placing the transferred TAA monies into the newly-created contingency reserve would (if the existing statute was so amended to provide) prevent those amounts from being passed on to annuitants as dividends. This contingency reserve buffer could potentially cause a reduction in future annuity increases if the twenty percent TAA transfer to current income (section 40.04(3)(a) as amended by 1989 Wisconsin Act 13) is by legislation prevented from reaching the annuitant. If the effect of the hypothetical statute is to phase out the TAA without increasing surplus distributions to annuitants, the validity of constitutional objections on contract infringement grounds would be based on the effect on individual annuitants weighed against whether the newly-created contingency fund is "useful in achieving the fund's purposes, or necessary to protect the interests of the participants or the future solvency of the fund." Sec. 40.04(1), Stats. The Legislature has in section40.04(1) granted this account-creating authority to the Department of Employe Trust Funds and thus presumably could exercise similar authority on its own. *Page 218 
There are insufficient facts to provide me with the basis to render an opinion on the constitutionality of the hypothetical legislation described in question 6. All laws are presumed constitutional and one attacking a statute must prove that statute unconstitutional beyond a reasonable doubt. Cannon,111 Wis.2d at 552-53. Section 40.19(1) provides, however, that "benefits accrued to an employe under this chapter for service rendered shall be due as a contractual right and shall not be abrogated by any subsequent legislative act. " The section40.27(2) fixed annuity reserve surplus distribution appears to be a benefit accrued by annuitants. Minimal alteration of contract rights does not constitute a constitutional impairment nor would an impairment which results from a necessity to protect the interests of the participants or future solvency of the fund. These factors cannot be sufficiently analyzed as the basis for an opinion without the specific details of the proposed statute.
Next you ask:
 7. Would s. 40.19 (1) present a constitutional bar to the Legislature limiting future interest credits to participant accounts and the annuity reserve to the present assumed rate (7-1/2%) and the present assumed benefit rate (5%), respectively?
It is my opinion that section 40.19(1) does not preclude the Legislature from prospectively limiting future interest crediting for that portion of a participant's account contributed after enactment of the limiting statute. Such statutory section does preclude the Legislature from limiting interest crediting for contributions made prior to the enactment of the limiting statute.
Section 40.19(1) provides vested contract rights "for service rendered" during employment. One of the contractual rights accrued "for service rendered" by WRS participants is the right to fixed annuity reserve surplus distributions. Section 40.19(1) was enacted effective January 1, 1982. Ch. 96, Laws of 1981. Participants who retired since that date probably have a contractual right to annuity increases based on distribution of *Page 219 
fixed annuity surpluses. Participants employed by WRS participating employers after January 1, 1982, and not yet retired, may also have a contractual right to future annuity increases based on "benefits accrued . . . for service rendered." That contractual right would continue until prospectively abrogated by the hypothetical legislation.
While section 40.19(1) authorizes "forfeiture of specific rights and benefits" that have vested, such forfeiture must under that statute be based upon the participant "receiving subsequently enacted rights and benefits of equal or greater value." Your question contains no quid pro quo for those WRS participants who are affected by the interest credit limitation, so this method of requiring forfeiture of vested rights appears inapplicable.
Section 40.19(2m) also specifically guarantees to a WRS participant, who was a participating employe during the period January 1, 1982 to March 9, 1984, the right to have his or her retirement benefit determined under the statutes in effect on his or her termination. Such section states as follows:
 Any person who is a participant in the Wisconsin retirement system before March 9, 1984, and who is not subsequently a participating employe in the Wisconsin retirement system shall continue to have the amount of, and eligibility for, the person's benefits determined in accordance with the statutes in effect on the date the person terminated as a participating employe.
Fixed annuity reserve distribution as mandated in section40.27(2) is an element of "benefits determined in accordance with the statutes in effect on the date the person terminated as a participating employe." Section 40.19(1) precludes abrogation of that contractual right "by any subsequent legislative act."
Even those WRS participants who were not participating employes after January 1, 1982, and thus not covered by the vesting language of section 40.19(1), may be held to have vested rights abrogated by the interest limitation. Section 40.19(3), *Page 220 
applying to WRS participants who were not participating employes after January 1, 1982 (the date of merger of the retirement systems), limits the benefit vesting to "the statutes in effect on the date the person terminated." Such section states:
 Any person who is a participant in the Wisconsin retirement fund or a member of either the state teachers retirement system or the Milwaukee teachers retirement fund prior to January 1, 1982, and who does not subsequently become a participating employe in the Wisconsin retirement system, shall continue . . . to have the amount of and eligibility for the person's benefits determined in accord with the statutes in effect on the date the person terminated as a participating employe.
The statutory benefits which vested on termination of employment prior to January 1, 1982, also included annuity improvements from distribution of annuity reserve surpluses. See secs. 41.20(1)(a) and 42.357(5), Stats. (1979). Statutes in effect prior to January 1, 1982, further provided that annuity reserve surplus distributions "shall not be offset against any other benefit received but shall be paid in full, nor shall any other benefit being received be reduced by any such distribution." See sec.40.70(3), Stats. (1979). It, therefore, appears that pre-1982 annuitants may have vested rights to annuity increases from annuity reserve surpluses that would be infringed by the subject interest limitation.
The degree of impairment determines the level of scrutiny by the courts. If there is substantial impairment, the courts will carefully examine the nature and purpose of the legislation. Whether there is a substantial impairment is not limited to the amount of money involved but takes into consideration whether "the legislation in question nullified an express term of the contract which was bargained for and reasonably relied upon by the parties." Cannon, 111 Wis.2d at 558. Active employes and annuitants are and were employed during times when the statutes vest in them the right to unlimited annuity improvements based *Page 221 
on surpluses in the annuity reserve. It was not unreasonable for participants to expect such unlimited interest crediting to annuity reserve accounts to continue for past service. While the severity of the impairment is not indicated, I assume that it would be severe if the hypothetical statutes were enacted in this session given the accelerated pass through by1989 Wisconsin Act 13 at sections 9 and 47(2).
It, therefore, appears that the impairment is severe and proscribed by the United States and Wisconsin Constitutions unless there "exist[s] a significant and legitimate public purpose behind the legislation," which purpose should be "directed towards remedying a broad and general social or economic problem." Chappy v. LIRC, 136 Wis.2d 172, 187-88,401 N.W.2d 568 (1967), "[I]t seems clear that, for the police power of the state of Wisconsin to affect the constitutionally protected right of contract, there should be evidence that the legislation is necessary for the vital interests of the state."State ex rel. Bldg. Owners v. Adamany, 64 Wis.2d at 300. Limiting of the interest crediting to annuitants does not appear to rise to the magnitude of "remedying a broad and general social or economic problem" nor would it seem to be "necessary for the vital interests of . . . the state."
There is nothing in question 6 which indicates such a public purpose. Saving and transfer of revenues to other purposes does not in itself indicate such a "vital interest."
 A government entity can always find a use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all.
United States Trust Co. v. New Jersey, 431 U.S. 1, 26 (1977). (Footnote omitted.) *Page 222 
 A statute that seeks to modify, by the invocation of the police power, a constitutionally guaranteed right, such as the right of contract, should be carefully drawn to show that the use of such power is necessary and exigent and serves a vital purpose of government. While courts are willing to indulge any reasonable presumption to sustain police-power-type legislation, they ought not be asked to speculate or conjure up possible explanations to support a legislative act.
State ex rel. Bldg. Owners v. Adamany, 64 Wis.2d at 303.
Present statutes allow "equitable" distribution of annuity surpluses. See sec. 40.27(2)(b), Stats.
 [A] State is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives. Similarly, a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well.
United States Trust Co. v. New Jersey, 431 U.S. at 30-31. It should be noted that the Legislature has chosen a more moderate course in the past by limiting interest crediting to employe accumulation accounts on a prospective basis. See section40.04(4)(a)2. which limits interest to the assumed benefit rate and section 40.04(4)(a)2m (as created by 1989 Wisconsin Act 13) which prospectively limits separation benefit interest to three percent. I therefore conclude that legislation limiting interest crediting to annuity reserve accounts, for contributions made before the enactment of the limiting statute, would probably be held unconstitutional. Your eighth question states:
 8. If a negative answer to any of the previous questions is based on the fact that many participants have made additional contributions to the WRS over and above the legally-required contributions, would the answers become positive if the statutory changes in each case *Page 223 
specified that the full investment earnings credit would be added to all such additional contribution amounts while limiting or directing the credits to required contribution accounts as previously noted?
None of the negative answers to previous questions is based on participants' rights generated from making additional deposits or being the beneficiary of additional deposits made by employers. Employes and employers (on behalf of employes) may make additional contributions to the WRS. Sec. 40.05(1)(a)5. and (2)(g), Stats. "[A]dditional employer contributions shall be available for all benefit purposes [except separation benefit] and shall be administered and invested on the same basis as employe additional contributions . . . ." Sec. 40.05(2)(g), Stats. A participant's account in the employe accumulation reserve is credited with both employer and employe additional deposits. Thus participants who have additional deposit credits have, as a minimum, the contractual rights of participants arising from required employe deposits.
The Legislature has apparently recognized greater rights resulting from additional deposits. Section 40.04(4)(a)2., which limits interest crediting to employe accumulations accounts to the assumed benefit rate (five percent) for participants after December 31, 1984, does not include "employe and employer additional contribution accumulations" within such interest limitation. Similarly, the section 40.04(4)(a)2m. (as created by1989 Wisconsin Act 13) limitation of interest to three percent for separation benefit purposes for those terminating covered employment on or after January 1, 1990, does not apply to additional contributions. While there are indications that there may be other bases for objection to statutes infringing on rights resulting from additional contributions, a discussion of such bases is unnecessary here absent specific statutory language for analysis.
 Your final question states: *Page 224 
 9. Is there any constitutional bar to the Legislature closing the present WRS and creating a new retirement system applicable to all future service of existing and future employes using the present WRS assets to fund all benefits accrued to the date of closing and applying the "excess" assets to reducing taxes?
It is my opinion that the Legislature can, without violating contract rights, close the present WRS and create a new retirement system for future service if it does not abrogate the various rights vested on the date of terminating the WRS. One of those vested rights is that of fixed annuity reserve surplus distributions under section 40.27. A second vested right is that of choosing the alternative purchase money form of annuity under section 40.23(3). A third right vested is that of a pre-1982 participant, applying for a separation, to have the effective rate of interest (including TAA increases to the current income account) credited in determining the amount of the separation benefit. Secs. 40.25(2) and 40.04(4)(a)2., Stats. I, therefore, have no basis upon which to assume that there would be any "excess assets" available on the hypothetical closing of the WRS since these vested rights have substantial claims on the trust funds.
Section 40.19(1) explicitly provides that "[r]ights exercised and benefits accrued to an employe under this chapter for service rendered shall be due as a contractual right and shall not be abrogated by any subsequent legislative act." Such statute continues by stating that the system can be repealed at any time and "there shall be no right to further accrual nor to future exercise of rights for service after . . . repeal." This contractual right based on service rendered includes benefits determined by and based upon monies in the TAA.
The Wisconsin Supreme Court has held, in the case of teachers, that certain benefits vested at commencement of teaching service. In State ex rel. Stafford v. State A. and I. Board, 219 Wis. 31,33, 261 N.W. 718 (1935), the court held that a legislative enactment that required payment from the contingency *Page 225 
fund of the State Retirement System (for teachers) to one not belonging to the group entitled to a benefit violated the contractual rights of the teachers participating in the fund. The court stated:
 The conceded facts show the nonexistence of a right or claim in this particular fund in Mr. Stafford at the time of his death. It therefore follows that the attempt to place within the reach of Stafford's estate or of his beneficiary this fund, or any portion of it, results in the invasion of the rights of others, because it is a direct impairment of contractual rights of teachers entitled to participate in said fund under a contract between them and the state.
219 Wis. at 33. There was no showing, in the case, that employed teachers' ultimate annuities would be affected other than by a potential lessening of the "distribution of gains and savings" authorized by section 42.34, Stats. (1935).
Similarly in State ex rel. O'Neil v. Blied, 188 Wis. 442, 447,206 N.W. 213 (1925), an attempt by the Legislature to repeal, retroactively, a death benefit provision of the 1921 Teachers Retirement Act was held to be an unconstitutional impairment of teachers employment contracts. Repeal of the death benefit was held constitutional, however, for teachers hired after the effective date of the repealing act.
In State Teachers' Retirement Board v. Giessel, 12 Wis.2d 5,9-10, 106 N.W.2d 301 (1960), the court stated:
 It is argued that the plaintiff board is required to pay out funds according to law and appropriations from the earnings of the fund have been made by law each year, and therefore there is no vested right in the gross earnings of the fund. We do not agree. The teacher's right, based on contract, extends to the retirement system. The earnings on investments, part of which represent contributions made by the teachers and part contributed by the state under the contract with them, *Page 226 
constitute assets of the system. The reserve for contingencies set up by the board is a part of the system.
 The appellant's argument would deny any rights to the earnings on the investment until they are allocated and credited to the individual teacher's account. The right cannot be construed so narrowly. The right includes the proper use of the earnings. The expense of administering the system, losses on investments, and other proper expenses and charges are, of course, to be paid by the system. However, the legislature and the plaintiff board are not free to spend or appropriate the earnings of the fund except in a manner authorized by statute relating to the state teacher's retirement system.
These three cases together indicate that contractual rights vest during employment and that those rights extend to the trust funds of the retirement system. While the three cited cases involved prior teacher retirement systems, the same concept is set forth in section 40.19(1). This interpretation is furthered by the stated purpose of the trust fund.
Section 40.01(2) sets forth the purpose of the trust fund, which funds operations of the WRS, as follows:
 The public employe trust fund is a public trust and shall be managed, administered, invested and otherwise dealt with solely for the purpose of ensuring the fulfillment at the lowest possible cost of the benefit commitments to participants, as set forth in this chapter, and shall not be used for any other purpose.
It, therefore, appears that vested rights of employes and annuitants in the "excess assets" may preclude use of those assets for other than benefit purposes.
DJH:WMS *Page 227